STATE OF NEW YORK ex rel. H., Appellant, v P., Respondent.

First Department, December 30, 1982

**APPEARANCES OF COUNSEL**

*Norman M. Sheresky* of counsel (*Kathleen H. Casey* with him on the brief; *Colton, Weissberg, Hartnick, Yamin & Sheresky,* attorneys), for appellant.

*Helene Brezinsky* of counsel (*Eleanor B. Alter* and *Margaret Goodzeit* with her on the brief; *Rosenman Colin Freund Lewis & Cohen,* attorneys), for respondent.

*Lawrence Kalik,* Guardian ad Litem.

**OPINION OF THE COURT**

SULLIVAN, J. P.

In this habeas corpus proceeding, brought by a husband to determine custody and visitation rights with respect to an infant daughter, the only issue of his marriage to the respondent wife, the wife, challenging the husband's paternity, has obtained an order directing him to submit to a blood-grouping test. The husband appeals.

The parties were married on September 28, 1975. On December 22, 1979, over four years later, during all of which time they were cohabiting, their daughter, Elizabeth, was born. One year earlier, however, the husband had been found to be sterile. Anxious to have children, the wife enrolled with her husband's consent in an artificial insemination program from which, she alleges, she withdrew after participating unsuccessfully for a period of several months. She claims that Elizabeth was thereafter conceived during a dalliance with an unnamed individual on a business trip to California.

The husband was recorded as the father on the birth certificate, and has always held himself out as such. Although she claims otherwise the husband states that the wife did not inform him of her extramarital episode and her belief that the child was not conceived either by normal intercourse with him or through artificial insemination with donor sperm, until well after the couple began to experience serious marital difficulties, soon after the child's birth. As a result of these difficulties, the husband stayed in a hotel for extended periods on several occasions between February and June, 1980. He regularly visited his child, however, sometimes even daily, and frequently stayed overnight on weekends.

Even after their final separation in June of 1980 the parties continued to recognize the husband as the child's father. During the summer of 1980 he had visitation with her every weekend, and for a week in August, when he took her to visit his family in Pennsylvania. Nor, during the initial stages of their separation, did the wife ever attempt to challenge his paternity. Indeed, she continued to encourage the father-daughter relationship, and accepted child support payments.

For Christmas, 1980 the wife gave the husband a book entitled "The Second Twelve Months of Life", which contained an inscription "Dear Daddy, The following pages are sure to keep you well-informed regarding my 'developmental whereabouts'. Thank you for a wonderful 'first 12 months'. Good luck in the next 12!! Love and kisses, Elizabeth." In early 1981 the wife, a college instructor in early childhood education, invited the husband to bring Eliza-

beth to one of her lectures. He was introduced to the class as Elizabeth's father. In April, 1981 the wife sent the husband a birthday card from Elizabeth "to Daddy".

Beginning in March of 1981 the parties also visited a child psychiatrist, with whose assistance they worked out a visitation schedule. The schedule permitted Elizabeth to be with the husband from Saturday morning to Sunday evening nearly every weekend, on Wednesday nights overnight, on another evening for dinner, for some additional weekend overnights, and for extended periods on vacations. During all of this time the husband continued to pay child support which, according to his estimate, amounts to approximately $40,000 for the period between July 1, 1980 and December 1981.[1]

In October, 1981 and, according to the husband, after the parties were unable to come to final terms on a financial settlement, the wife threatened to deny and eventually withheld visitation. At that point the husband initiated this habeas corpus proceeding. In her answer the wife asserted that the husband had no right to custody or visitation since he was not the child's father. She alleged that the husband had known from the time of birth both that Elizabeth was not his daughter as well as how she was actually conceived. The wife insisted that she permitted him to see the child only as an accommodation, and after being harassed and harangued in tirades that continued until she beleagueredly consented, but that the husband's behavior had subsequently become so irrational as to endanger the child's welfare. She cites an instance in March, 1981, when he referred to the child as "the little bastard" and his repeated threats to sleep with Elizabeth when she is older.

Since September of 1980 the wife has been living with a man whom she expects to marry but who, according to her, is not the father of the child. The wife has refused to name the natural father, but alleges that she has obtained his consent to Elizabeth's adoption by the prospective husband.

To support her claim that the husband is not the child's father, the wife sought to have him submit to both a blood-

---

1. Although the wife now claims that these payments came out of joint assets, it is clear that they were intended and accepted as child support.

grouping test to determine his blood relationship to Elizabeth, and a procedure known as a bilateral repeat testicular biopsy to ascertain whether he was capable of producing sperm cells. Special Term refused to direct the biopsy because the results would not be determinative of sterility at the time of conception, and would be superfluous in view of the availability of the husband's medical records before and after Elizabeth's birth. The court, however, did direct the husband to submit to a blood test, inasmuch as such examination "specifically is authorized by statute and is minimally intrusive."[2] We believe that because such test has the potential to bastardize the child without settling the issue of paternity it offends this State's public policy, which presumes the legitimacy of children born during wedlock, and, accordingly, reverse.

The presumption of legitimacy is "one of the strongest and most persuasive known to the law". (*Matter of Findlay,* 253 NY 1, 7, citing cases; see *Matter of Schenectady County Dept. of Social Servs. v Hilvan RR,* 57 AD2d 688, 689.) Rooted in the common law, its force was so potent that neither spouse was competent to testify to nonaccess during wedlock. Thus, "[i]f a husband, not physically incapable, was within the four seas of England during the period of gestation, the court would not listen to evidence casting doubt on his paternity." (*Matter of Findlay,* 253 NY, at p 7; see *Cross v Cross,* 3 Paige Ch 139.)

In *Goodright ex dim. Stevens v Moss* (2 Cowp 591, 592-594), the court outlined the principle which has come to be known as Lord Mansfield's Rule: "[T]he law of England is clear, that the declarations of a father or mother, cannot be admitted to bastardize the issue born after marriage * * * But it is a rule founded in decency, morality, and policy that they shall not be permitted to say *after marriage,* that they have had *no connection,* and therefore that the offspring is spurious". Subject to certain statutory exceptions, New York has adopted Lord Mansfield's Rule. (See *Commissioner of Public Welfare of City of N. Y. v Koehler,* 284

---

**2.** CPLR 3121 (subd [a]) authorizes a blood examination upon the mere service of notice therefor if "the blood relationship of a party * * * is in controversy". In special proceedings, of which habeas corpus is one, leave of court is required to use any of the disclosure devices except the notice to admit. (CPLR 408.)

NY 260; *Lovelace v Arcieri,* 17 AD2d 465; *Anonymous v Anonymous,* 1 AD2d 312.) The present statutory exceptions to the rule against spouses testifying to nonaccess to each other are found in section 436 (support proceedings) and section 531 (filiation proceedings) of the Family Court Act.

While the presumption of legitimacy is, of course, rebuttable, it "will not fail unless common sense and reason are outraged by a holding that it abides." (*Matter of Findlay,* 253 NY, at p 8; see *Matter of Fay,* 44 NY2d 137.) In *Findlay* (*supra,* p 8) the court also noted that "[i]f husband and wife are living together in the conjugal relation, legitimacy will be presumed though the wife has harbored an adulterer".

In this case, not even the husband's sterility will disturb the presumption of legitimacy since the wife concededly received donor sperm by means of artificial insemination on at least 10 occasions prior to conception. Noteworthy in this regard is the wife's careful avoidance in her affidavit of even approximating the date that she discontinued her participation in the program. By statute in New York (Domestic Relations Law, § 73, subd 1)[3] a child born to a married woman through artificial insemination performed with the consent of the woman and her husband is legitimate. Thus, the husband's claim to paternity is first, that he had sexual access to the wife during the period in which the child was conceived[4] and which access the wife may not deny since this is neither a support nor filiation proceeding

3. Subdivision 1 of section 73 of the Domestic Relations Law provides, "Any child born to a married woman by means of artificial insemination performed by persons duly authorized to practice medicine and with the consent in writing of the woman and her husband, shall be deemed the legitimate, natural child of the husband and his wife for all purposes."

4. In his brief and on oral argument the husband refuses to concede that he is not the biological father despite his attorney's statement in open court, with the husband present, that "[i]t is not the claim that he is the natural father." Although a statement in open court conceding a fact, if made with sufficient formality and conclusiveness, constitutes a judicial admission (*Berner v British Commonwealth Pacific Airlines, Ltd.,* 346 F2d 532, cert den 382 US 983) which is admissible (*Vicherek v Papanek,* 281 App Div 498), even when made by a party's attorney (*Catanese v Lipschitz,* 44 AD2d 579), Special Term, we think, properly observed that the statement could not be "accepted as final, it not being in the child's best interests." A reading of the transcript reveals that counsel was attempting to assert the husband's natural paternity claim through artificial insemination.

(Family Ct Act, §§ 436, 531); and, secondly, the wife participated with his consent in an artificial insemination program wherein she received donor sperm.

New York courts have not hesitated to order the production of evidence in the form of blood tests to overcome the presumption of legitimacy when a child's paternity is an issue. (See, e.g., *Kwartler v Kwartler,* 291 NY 689; *Maureen G. v Kenneth G.,* 56 AD2d 644; *O'Brien v O'Brien,* 4 AD2d 867, mot for lv to app granted 4 AD2d 946; *Anonymous v Anonymous,* 1 AD2d 312, *supra*.) But in each of these cases the blood test ordered would have settled the paternity question at issue, one way or the other.

Here, however, even if the blood test showed that the husband was not the natural father, the results would still not be dispositive since the child could have been conceived by artificial insemination. Thus, the test could not be used to deprive the husband of his claim to legal paternity. Only a blood test of the unnamed putative father could settle that question. As the guardian ad litem aptly notes, testing the husband will either only confirm that he is, indeed, the natural father, a fact already presumed (*Matter of Findlay,* 253 NY 1, *supra*), or rebut his claim to biological paternity without achieving the salutary corollary effect of establishing the identity of the natural father. In practical terms, a negative finding can only stigmatize the child as the offspring of some anonymous sperm donor or stranger her mother will not even name.

Thus, since the wife has failed to set forth sufficient facts to place the blood relationship of any party in issue, no evidentiary purpose would be served by forcing the husband to submit to a blood test. Indeed, no purpose would be served at all by bastardizing the child, and depriving her of the only father she has ever known, a father who, under any objective analysis of the competing claims and the record made at Special Term, has apparently never retreated from his intention to care for her and treat her as his daughter. In this connection the husband has submitted affidavits from 12 reputable individuals attesting to his love and affection for Elizabeth and the close bond which

exists between them. The child psychiatrist who counselled the parties, and who, according to the wife, was told of the husband's nonpaternity, has also submitted an affidavit urging continued visitation rights for the husband.

Nor can we ignore the timing of the wife's assertion of nonpaternity. As late as December 18, 1980, one year after the child's birth, the wife's former attorney wrote the husband's attorney to urge an expeditious settlement of the parties' differences. At that time counsel noted her concern about the husband's alleged payment of child support out of joint assets and the wife's complaint about the inadequacy of the payments. No suggestion was made that custody and visitation were a problem or paternity an issue. This court is well aware of the spite that is engendered when once stable marital relationships disintegrate, and of the tactics used by both husbands and wives when matters of alimony, child support and visitation are at issue.

In the circumstances presented the wife should be estopped from contesting the husband's paternity. New York courts have not hesitated to apply the principle of equitable estoppel to bar a denial of paternity of a child born during wedlock where the spouse asserting the claim has always held out himself or the husband, as the case may be, as the father. (*Hill v Hill,* 20 AD2d 923; see *Montelone v Antia,* 60 AD2d 603; *Brite v Brite,* 61 Misc 2d 10; *Time v Time,* 59 Misc 2d 912.) The facts in *Hill* are quite analogous to those in this case. There, the husband sought custody of a nine-year-old child born to the wife during the marriage and at a time when the parties were living together as husband and wife. Denying the child was the issue of the marriage, the wife moved for an order directing that the question of paternity be resolved in her favor since the husband had refused to submit to a blood-grouping test. In affirming the denial of the wife's motion the court held: "Common sense, public policy, reason and the overriding consideration for the welfare of the child will bar a wife from bastardizing her child where, as here, she lived with her husband as his wife during the period of conception and birth of the child and for six years thereafter — all

the while concealing from him the adultery to which she now confesses for the sole purpose of securing the child's custody." (*Hill v Hill,* 20 AD2d, at p 924.)

As in *Hill* (*supra*), the wife here originally did not dispute the husband's paternity. She held Elizabeth out as his child. He was listed as the father on the birth certificate. The wife herself apparently encouraged, fostered and nurtured a loving father-daughter relationship, even after the parties separated. Accepting his status as the father, the husband has been intimately involved in every aspect of the child's growth and development. Elizabeth, for the first two and one-half years of her life, has been raised in the understanding that he was her father. To countenance the wife's attempt to deny the husband's paternity, after she allowed the husband and Elizabeth to develop a father-daughter relationship, would be a cruel and unseemly affront to decency and morality to which the law should not give its imprimatur.

Accordingly, the order of Supreme Court, New York County (STECHER, J.), entered April 13, 1982, granting respondent's motion for an order directing petitioner to submit to a blood-grouping test, should be reversed, on the law, without costs or disbursements, and the motion denied.

SILVERMAN, J. (concurring). On the facts of this case, whether the husband is or is not the biological parent is almost, if not quite, irrelevant to the issue of custody and visitation. If it has any remote relevance, the probative value of such evidence is far outweighed by the possible damage to the child.

ROSS, BLOOM and ALEXANDER, JJ., concur with SULLIVAN, J. P.; SILVERMAN, J., concurs in an opinion.

Order, Supreme Court, New York County, entered on April 13, 1982, unanimously reversed, on the law, without costs and without disbursements, and respondent's motion to direct petitioner to submit to a blood-grouping test denied.