No. 93-427

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

IN RE THE MARRIAGE OF

K.E.V.,

       Petitioner, Respondent,
       and Cross-Appellant,

  and

M.L.V.,

       Appellant and Respondent.

# FILED

OCT 25 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM: District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

    Mark P. Yeshe, Helena, Montana

    For Respondent:

    J. Richard Orizotti, Poore, Roth & Robinson, Butte,
    Montana

Heard: May 19, 1994
Submitted: June 28, 1994

Decided: October 25, 1994

Filed:

_____
Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This is an appeal by the wife from an Order of the District Court of the First Judicial District, Lewis and Clark County, which barred her from claiming the nonexistence of the father-child relationship for purposes of child custody. The husband cross-appealed from the portion of the District Court's order ruling that the wife was not time-barred from asserting the nonexistence of the father-child relationship. We affirm.

The restated issues are as follows:

I. Is the mother's claim seeking to declare the nonexistence of the father-child relationship time-barred after five years under § 40-6-108(1)(b), MCA (1983)?

II. Did the District Court err in applying the doctrine of equitable estoppel to prevent the mother from contesting the father-child relationship?

After several years of an on-again, off-again relationship between the parties in this proceeding, M.L.V. became pregnant and advised K.E.V. that he was the father of her child. K.E.V. (husband) and M.L.V. (wife) claim to have begun a common law marriage in September of 1985, prior to the birth of K.R.V. in November of the same year.

K.E.V. moved in with M.L.V. and her four children from a prior marriage, changed his lifestyle and became involved in the marriage, M.L.V.'s pregnancy and the establishment of the family unit. K.E.V. was present at the birth of K.R.V. and thereafter became an involved and loving parent, according to the testimony of

2

numerous witnesses on his behalf. He signed papers presented to him by the attending doctor relating to the birth certificate at the time of K.R.V.'s birth.

K.R.V.'s birth certificate shows K.E.V.'s surname but he has never been named as the father on an official birth certificate, apparently due to a mixup in recordkeeping at the Gallatin County Registrar's office. The Gallatin County Registrar's office wrote to M.L.V. shortly after K.R.V.'s birth advising her that K.E.V. could not be listed on the birth certificate without an affidavit from M.L.V.'s former husband stating he was not the father of the child. K.E.V. testified he felt it was up to M.L.V. to correct the error because he had signed the proper documents at the time of the birth.

K.E.V. and M.L.V. later attempted to clarify the matter by contacting the Gallatin County Registrar and the Department of Health Vital Statistics Bureau in Helena. As a result, it was determined that M.L.V.'s former husband did not need to sign any documents and that K.E.V. could be listed as the father on K.R.V.'s birth certificate by signing an acknowledgment of paternity. K.E.V. did not sign the document immediately and M.L.V. continued to urge him to do so. When he finally signed the acknowledgment of paternity in October of 1991, M.L.V. refused to sign it until the parties had a formal wedding. The parties never had a formal wedding and the official birth certificate still lists no father.

M.L.V. first challenged K.E.V.'s paternity in K.E.V.'s first petition for dissolution of the marriage filed in April of 1992

3

after K.E.V. was granted sole temporary custody of K.R.V. The District Court granted M.L.V.'s motion to quash this custody order on the basis that K.E.V.'s name did not appear on K.R.V.'s birth certificate as the father, and the District Court had no authority to award custody to a non-parent except under certain circumstances not present in this case. The court then granted sole custody to M.L.V.

After that, the parties reunited for a time, but their reconciliation was short-lived. K.E.V. filed a second petition for dissolution on December 15, 1992. K.E.V. testified that because M.L.V. had continually represented to him that he was K.R.V.'s natural father until she raised the issue in the first dissolution proceeding, he moved the court for an order requiring blood testing in order to confirm that he was the biological father of K.R.V. K.E.V. also obtained sole custody of K.R.V. on December 15, 1992, which was later modified to joint custody with primary physical custody with K.E.V.

This was not the first time blood-testing had been done. The first tests were performed when K.R.V. was a newborn infant and did not rule out K.E.V. as the father of K.R.V. No further testing was done although more conclusive testing could have been performed when K.R.V. reached the age of six to eight months. The test results from the recent second testing, however, proved that K.E.V. is not K.R.V.'s biological father. K.E.V. is the only father K.R.V. has ever known and he has been an involved parent--an involvement encouraged by M.L.V.

4

After a hearing in April 1993, the District Court ruled that the doctrine of equitable estoppel and the conclusive presumption found in § 26-1-601(1), MCA, prevented M.L.V. from denying the existence of the father and child relationship between K.E.V. and K.R.V. The court had also determined that the statute of limitations in effect at the time of K.R.V.'s birth had been held unconstitutional by this Court and, therefore, did not bar M.L.V. from asserting that K.E.V. was not K.R.V.'s father.

### Issue I: Statute of Limitations

Is the mother's claim seeking to declare the nonexistence of the father-child relationship time-barred after five years under § 40-6-108(1)(b), MCA (1983)?

Section 40-6-105, MCA, provides a rebuttable presumption of paternity for children born during a marriage for purposes of actions to declare the existence or nonexistence of a father-child relationship. Presently, the statute of limitations applicable to paternity actions provides that a proceeding may be brought to declare the existence or nonexistence of the presumed father and child relationship without a specific time limitation. See § 40-6-108(1), MCA.

At the time of K.R.V.'s birth, however, § 40-6-108(1)(b), MCA (1983), allowed only five years for bringing such an action. The District Court determined that the five-year statute of limitations in effect at the time of K.R.V.'s birth had been held unconstitutional in State of Arizona v. Sasse (1990), 245 Mont. 340, 801 P.2d 598, and thus did not bar M.L.V. from bringing an action to declare the nonexistence of the presumed father-child

5

relationship between K.E.V. and K.R.V.  K.E.V. contends that Sasse does not apply to this case as the 1983 version of § 40-6-108(1), MCA, was in effect when K.R.V. was born.  He contends that Sasse found the statute unconstitutional as applied to the facts of that case and that the Montana Legislature's subsequent change in § 40-6-108, MCA, to allow the commencement of a paternity proceeding any time does not affect the outcome of this case.  K.E.V. further contends that the holding of Sasse applies only to cases brought to establish a support action.  We disagree.

While it is true that a statute may be declared unconstitutional as applied to the facts of a particular case and constitutional as applied to the facts of another case, that was not this Court's ruling in Sasse.  In Sasse, the Court addressed a constitutional challenge to the five-year limitation period in the context of an action to collect child support under the Uniform Reciprocal Enforcement of Support Act (URESA).  Sasse involved a discriminatory classification based on illegitimacy whereby the challenged statute on its face allowed only five years for children with presumed fathers to bring an action to establish paternity while allowing twenty years to illegitimate children to commence such a paternity action.  Based on the United States Supreme Court's holding in Clark v. Jeter, 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988), we applied an intermediate scrutiny test to the facts presented in Sasse.  Sasse, 801 P.2d at 601.

If the effect of the ruling in Sasse is anything other than one rendering the entire statute unconstitutional for all purposes,

6

then M.L.V. may be time-barred from bringing the claim as K.R.V. was five years old on October 14, 1990. Sasse was decided on November 27, 1990. We conclude that the unconstitutional classification in Sasse, where the statute on its face created different limitation periods for children with presumed fathers and children without presumed fathers, was not limited to support questions under URESA. Sasse states:

> . . . The effect of this decision setting aside the five-year limitations in paternity actions should not be overestimated. We have simply set aside a time-bar that may otherwise have thwarted the truth in URESA or other paternity actions. There is no restraint under this decision that prevents a court in this state from considering other issues that might arise in such actions once the time-bar is lifted. . . . Thus our courts are not fenced off under URESA from considering other issues than support that may affect the child, or his adoptive, natural or presumed parents.

Sasse, 801 P.2d at 602 (emphasis supplied). The District Court stated that "a close reading shows [Sasse] brooks no other interpretation but that the Montana Supreme Court declared Section 40-6-108(1)(b), MCA, wholly unconstitutional." We agree. This language clearly states that the five-year period will not limit an action which addresses issues other than support which can affect the child or even his presumed parents.

We hold the mother's claim seeking to declare the nonexistence of the father-child relationship is not time-barred after five years under § 40-6-108(1)(b), MCA (1983).

### Issue II:   Equitable Estoppel

Did the District Court err in applying the doctrine of equitable estoppel to prevent the mother from contesting the father-child relationship?

7

Notwithstanding its ruling on the statute of limitations, the District Court refused to allow M.L.V. to further pursue an action to rebut the presumption of K.E.V.'s paternity. The District Court based this decision on the doctrine of equitable estoppel.

The Uniform Parentage Act (UPA), Title 40, Chapter 6, MCA, includes the following rebuttable presumption referred to in Issue I above:

> **40-6-105. Presumption of paternity.** (1) A man is presumed to be the natural father of a child if:
>
> (a) he and the child's natural mother are or have been married to each other and the child is born during the marriage . . .
>
> . . . or
>
> (d) while the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child; . . .

The UPA provides for specific procedures to be followed in an action to determine, among other things, the nonexistence of the presumed parent-child relationship.

The presumption of paternity provided for in § 40-6-105(1), MCA, may be rebutted "in an appropriate action by a preponderance of the evidence." Section 40-6-105(2), MCA. M.L.V. contends that the presumption is rebutted in this case by uncontroverted medical tests which prove that K.E.V. is not the biological father of K.R.V. While this may be true, we need not address the medical evidence as we are here concerned with the question whether M.L.V. is equitably estopped from bringing the appropriate action to rebut the presumption. As discussed below, we agree that M.L.V. is estopped from challenging K.E.V.'s paternity and, therefore, her

8

contentions pertaining to K.E.V.'s alleged status as a non-parent and its effect on custody in this case are not germane.

In essence, what M.L.V. has tried to do here is to deny K.E.V. is the father of K.R.V. so that she might have sole custody; she has not pursued any procedures to declare that another man is the child's father. K.E.V. correctly maintains that the presumption of legitimacy of a child born during a marriage is one of the strongest and most persuasive known to the law. The New York court of appeals has eloquently described the effect of the presumption as follows:

> Rooted in the common law, its force was so potent that neither spouse was competent to testify to non-access during wedlock. Thus, "[i]f a husband, not physically incapable, was within the four seas of England during the period of gestation, the court would not listen to evidence casting doubt on his paternity." . . .
>
> In Goodright v. Moss (2 Cowp. 591), the court outlined the principle which has come to be known as Lord Mansfield's Rule:
> "The Law of England is clear that the declarations of a father or mother cannot be admitted to bastardize the issue born after marriage. * * * It is a rule founded on decency, morality, and policy that they shall not be permitted to say after marriage that they have had no connection and therefore that the offspring is spurious. . . .

State ex rel. H. v. P. (N.Y. App. Div. 1982), 457 N.Y.S.2d 488, 490-91. (Emphasis in original.) As quoted above, Montana codifies this presumption as part of the UPA with certain provisions for rebutting it. It is further codified in § 26-1-602(31), MCA: "A child born in lawful wedlock, there being no divorce from bed and board, is legitimate."

9

With changing societal views concerning divorce and illegitimacy over the years, we have seen an increase in the number of families which are not the "traditional" family composed of mother, father and their biological children. Family law courts have used several theories to reach an equitable result when there are children involved and where there are established parent-child relationships including persons other than their biological parents. These include equitable estoppel, equitable parentage, in loco parentis, de facto parent and "psychological parent" theories. See, e.g., Annotation, Parental Rights of Man Who is Not Biological or Adoptive Father of Child but was Husband or Cohabitant of Mother When Child was Conceived or Born, 84 A.L.R. 4th 655 (1991); A. Haralambie, 1 Family Law Series: Handling Child Custody, Abuse, and Adoption Cases § 10.11 (2d ed. 1993); H. Clark, Jr., 2 The Law of Domestic Relations in the United States § 20.6 (2d ed. 1987); and J. McCahey, M. Kaufman and C. Kraut, 1 Child Custody & Visitation Law and Practice § 1.03 (1994).

In this case, the District Court concluded that equitable estoppel applies to estop the mother from denying the presumed paternity of K.E.V. Estoppel has been used in other parentage cases as well, with perhaps the most common application being that of preventing a presumed father from denying paternity for purposes of a support obligation. In many cases, the estoppel runs in favor of the child, not the spouse. For a good general discussion of this topic, see W. Simpson, The Power of Positive Parenting:

10

Equitable Estoppel in Paternity Cases, 4 Divorce Litigation 95 (May 1992).

As with the presumption of legitimacy, equitable estoppel has long been recognized in Montana and is used to prevent injustice and to promote justice, honesty and fair dealing. It is founded in equity and good conscience and its object is to prevent a party from taking unconscionable advantage of his or her own wrong while asserting a strict legal right. In the Matter of Shaw (1980), 189 Mont. 310, 316, 615 P.2d 910, 914. We conclude that it is appropriate to apply the doctrine of equitable estoppel in this case.

In Dagel v. City of Great Falls (1991), 250 Mont. 224, 234-35, 819 P.2d 186, 192-93, we clarified the Montana law concerning estoppel, reaffirming and readopting the six elements of estoppel as previously set forth in Sweet v. Colborn School Supply (1982), 196 Mont. 367, 639 P.2d 521. In addition, we stated that the conclusive presumption from § 26-1-601, MCA, applied to the facts of that case as well. Section 26-1-601, MCA, provides in pertinent part:

> **26-1-601. List of conclusive presumptions.** The following presumptions are conclusive:
>
> (1) the truth of a declaration, act, or omission of a party, as against that party in any litigation arising out of such declaration, act, or omission, whenever he has, by such declaration, act, or omission, intentionally led another to believe a particular thing true and to act upon such belief;

In this case, K.E.V. has demonstrated that M.L.V. led him to believe he was the father of K.R.V., that M.L.V. encouraged him to

11

act upon that belief and that he acted upon that belief. We conclude this satisfies the criteria of § 26-1-601(1), MCA.

We next consider the six essential elements of equitable estoppel:

(1) there must be conduct, acts, language, or silence amounting to a representation or a concealment of material facts; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under the circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it, and (6) he must in fact act upon it in such a manner as to change his position for the worse. (Citations omitted.)

Dagel, 819 P.2d at 192.

In the present case, the Court concludes that K.E.V. has demonstrated these elements by the required clear and convincing evidence. See Berglund and Berglund, Inc. v. Department of Labor and Indus. (1990), 241 Mont. 49, 53, 784 P.2d 933, 936. Estoppel theories must rest on representation of facts. Minervino v. University of Montana (1993), 258 Mont. 493, 497, 853 P.2d 1242, 1245. Equitable estoppel is a term used where a party is denied the right to prove an otherwise important fact because of something which the party has done or omitted to do. Norman v. State (1979), 182 Mont. 439, 443-44, 597 P.2d 715, 718.

The facts which M.L.V. represented or omitted to tell to K.E.V. are as follows: M.L.V. told K.E.V. she had terminated her

12

relationship with her former husband several months prior to the time K.R.V. was conceived. Although she now claims she was raped by her former husband at approximately the time K.R.V. was conceived, she did not tell K.E.V. even though K.E.V., as an attorney, had represented her in that dissolution proceeding and had had confrontations with him on at least two occasions. In February or March of 1985, M.L.V. informed K.E.V. that she was pregnant with his child. K.E.V. told her that he would accept his obligations and responsibilities as the child's father.

In September of 1985, K.E.V. and M.L.V. began living together in a common law marriage, according to the findings of the District Court and the testimony of each of the parties. K.E.V. purchased maternity clothing for M.L.V. and paid medical expenses pertaining to the pregnancy and K.R.V.'s birth. He psychologically prepared himself for the birth and was present during the delivery. Since the child's birth, K.E.V. has assumed the financial responsibility for K.R.V. Even before her birth, K.E.V. was an involved parent--a position encouraged by M.L.V. Because of concerns raised by K.E.V.'s family, mother, father and baby underwent blood tests at the end of October of 1985, approximately two weeks after K.R.V.'s birth. These tests did not exclude K.E.V. as the biological father. M.L.V. and K.E.V. were informed at that time that more conclusive testing could be performed about six to eight months after K.R.V.'s birth. They did not pursue this further testing until the second dissolution petition was filed.

13

K.E.V. testified that he underwent the blood testing because he wanted K.R.V. to be accepted by his family. M.L.V. testified that she told K.E.V. that she had been raped by her former husband and that the child could be his or K.E.V.'s child. K.E.V. testified that M.L.V. never told him there was a question of paternity and never told him she had been raped. To the contrary, she reaffirmed that K.E.V. was K.R.V.'s father by attempting to list K.E.V. on the birth certificate and by providing K.E.V.'s surname on the certificate for the child's name. The primary reason why K.E.V.'s name was not on K.R.V.'s birth certificate as her father was the record mixup in the Gallatin County Registrar's Office which showed that M.L.V. was still married despite a divorce granted five years previously.

In an attempt to straighten out the birth records, M.L.V. urged K.E.V. to sign the acknowledgement of paternity to correct the records. When he finally signed it, she refused to sign unless the parties formalized their marriage. M.L.V. also testified that she wanted K.R.V. to be K.E.V.'s child and that she did indeed make comments about the two having similar features. Witnesses testified that M.L.V. had made numerous comments about their likeness to one another. In a will prepared by M.L.V., she stated that she had a fifth child born of her marriage to K.E.V. and specifically declared she was married to K.E.V. Moreover, in response to the petition for dissolution in this action, M.L.V. denied that the marriage was irretrievably broken and alleged that

14

the welfare of K.R.V. might be adversely affected by a dissolution and filed a motion for conciliation.

The District Court stated:

> There was conduct, acts or language by [M.L.V.] which amounted to a representation of a material fact, viz., that [K.E.V.] was [K.R.V.'s] father. As the speaker of these facts, [M.L.V.] knew of them; [K.E.V.] did not know of the falsity of these facts at the time; [M.L.V.] knew that her conduct would cause [K.E.V.] to act in certain ways; [K.E.V.] relied upon what [M.L.V.] told him and it led him to act upon it; and [K.E.V.] did actually change his position, in fact, his very life, detrimentally.

We conclude that M.L.V.'s conduct as partially set forth above establishes all six elements of equitable estoppel by clear and convincing evidence. We note that the reference to a "detrimental" change in position by K.E.V. in this case is not in any way to be construed to mean that K.E.V. is adversely affected by his assumption of a parental role here. It is clear from the record that K.E.V. has a close, loving relationship with K.R.V. that is a very positive part of both of their lives which he wants to continue. The term "detrimental" as used in the context of these proceedings means that K.E.V. has been required to respond to M.L.V.'s self-serving proof that he is not K.R.V.'s biological father. To allow M.L.V. to assert that K.E.V. is not the presumed father of K.R.V. would be to allow her to take advantage of her own wrong. This would be both unconscionable and inequitable.

We hold the District Court properly applied the doctrine of equitable estoppel to the facts presented in this case to prevent

15

M.L.V. from contesting the presumed father-child relationship between K.E.V. and K.R.V.

The concurring and dissenting opinion of Chief Justice Turnage states that the Court has created a father-child relationship between K.E.V. and K.R.V. without so much as providing notice to the biological father, and has emphasized that a child cannot have two fathers at the same time. This opinion does not address the issue of the identity of the biological father of K.R.V. M.L.V. did not request a determination in this proceeding of the identity of the biological father. No evidence has been presented sufficient to establish that identity. M.L.V. testified that she had been raped by her former husband but that in itself is insufficient to constitute identification of the biological father. This opinion does not address the issue of the identity of the true biological father of K.R.V. The holding of this opinion does not in any way bar the biological father or the child, K.R.V., from commencing a proceeding to determine the identity of the biological father.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____
_____
_____
Justices

16

Chief Justice J. A. Turnage, concurring in part and dissenting in part:

I concur with the majority that the claim of M.L.V. is not barred by the five-year statute of limitations under § 40-6-108(1)(b), MCA (1983). However, I respectfully dissent from the majority's conclusion that M.L.V. is barred from challenging the existence of the father-child relationship on the basis of equitable estoppel.

First, equitable estoppel is an unfavored doctrine and can only be sustained upon clear and convincing evidence. Kenneth D. Collins Agency v. Hagerott (1984), 211 Mont. 303, 684 P.2d 487. The record does not establish by clear and convincing evidence that M.L.V. misled K.E.V. about the paternity of K.R.V. There was evidence that the uncertain paternity of K.R.V. had been a subject of conjecture by M.L.V. and K.E.V. since K.R.V.'s birth.

Second, and of even more concern to me, the Court has created a father-child relationship between K.E.V. and K.R.V. without so much as providing notice to the biological father. What about his rights or standing? A child cannot have two fathers at the same time, under the law. Yet there is no indication in the record that the parental rights of the biological father have been either terminated or relinquished under the procedures established in § 40-6-129 or § 40-6-135, MCA, or in Title 41, chapter 3, part 6, MCA. Assumedly, then, his parental rights still exist. How will his parental rights be reconciled with those granted to K.E.V. under the majority opinion?

Finally, we have consistently held that parental rights cannot be acquired by a non-biological parent except after following a

17

statutory procedure. See, Henderson v. Henderson (1977), 174 Mont. 1, 568 P.2d 177; Matter of Guardianship of Doney (1977), 174 Mont. 282, 570 P.2d 575 (abuse, dependency and neglect statutes); Pierce v. Pierce (1982), 197 Mont. 255, 645 P.2d 1353 (adoption statutes); Matter of Guardianship of Aschenbrenner (1979), 182 Mont. 540, 597 P.2d 1156 (guardianship statutes); Marriage of Miller (1992), 251 Mont. 300, 825 P.2d 189 (marriage dissolution statutes). In creating, under the guise of equity, parental rights in a person who, indisputably, is not a biological parent, without first terminating the rights of the biological father and mother, we have not only totally ignored our prior case law, but we have also abrogated the very necessary function of the legislature to pass statutes authorizing the type of social engineering that we here accomplish by judicial fiat. There is truth in the old adage that, once you open a can of worms, you can never put them back, except in a larger can--if you can find a larger can.

Given the apparent identifiability of K.R.V.'s biological father and the failure of K.E.V. to establish the elements of equitable estoppel by clear and convincing evidence, I would reverse the District Court's ruling as to Issue II.

J.A. Turnage
_____
Chief Justice

Justice James C. Nelson joins in the opinion of Chief Justice Turnage.

_____
Justice

18

Justice Terry N. Trieweiler specially concurring in part and dissenting in part.

I concur with that part of the majority's opinion which affirms the District Court's finding and conclusion that the doctrine of equitable estoppel precludes M.L.V. from contesting the presumed father-child relationship between K.E.V. and K.R.V.

I dissent from that part of the majority's opinion which concludes that M.L.V.'s challenge to K.E.V.'s paternity is not barred by the statute of limitations found at § 40-6-108(1)(b), MCA (1983).

The majority's conclusion that M.L.V.'s challenge to K.E.V.'s paternity was not barred by the statute of limitations is based on its conclusion that, in *State of Arizona v. Sasse* (1990), 245 Mont. 340, 346, 801 P.2d 598, 602, § 40-6-108(1)(b), MCA (1983), was found facially invalid, rather than invalid as applied to the facts in that case. Since there was absolutely no analysis of facial invalidity versus applied invalidity in the *Sasse* case, the majority's conclusion is unfounded.

> Conventional wisdom holds that a court may declare a statute unconstitutional in one of two manners: (1) the court may declare it invalid on its face, or (2) the court may find the statute unconstitutional as applied to a particular set of circumstances. The difference is important. If a court holds a statute unconstitutional on its face, the state may not enforce it under any circumstances, unless an appropriate court narrows its application; in contrast, when a court holds a statute unconstitutional as applied to particular facts, the state may enforce the statute in different circumstances.

> In recent years, the Supreme Court has purported to disfavor facial challenges. As the Court stated in *United*

19

*States v. Salerno*, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."

Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 236 (January 1994) (footnotes omitted) (emphasis added). In *Sasse*, there was no analysis of whether § 40-6-108(1)(b), MCA (1983), could withstand a facial challenge to its constitutionality. In fact, our prior decision in *Matter of W.C.* (1983), 206 Mont. 432, 671 P.2d 621, indicates that it could. Under the circumstances presented in *Matter of W.C.*, at least, we held that there were circumstances under which the statute of limitations would be valid. Although *Matter of W.C.* was discussed and distinguished in *Sasse*, it was not reversed or otherwise modified.

Furthermore, our decision in *Sasse* analyzed statutory classifications based on illegitimacy in the context of the equal protection clause found at Article II, Section 4, of the Montana Constitution, and the Fourteenth Amendment to the United States Constitution. There are no similar classifications affected by the statute's application to the facts in this case. Therefore, there is not even a basis for an equal protection challenge in this case.

In *Sasse*, an action was commenced in Montana by a child's mother and the State of Arizona under the Uniform Reciprocal Enforcement of Support Act to establish Alan Sasse's paternity of that child and to recover child support from him. However, the

20

child was born during the mother's marriage to another person, and more than five years had passed since the child's birth. Since there was a statutory presumption pursuant to § 40-6-105(1)(a), MCA, that someone other than Sasse was the child's natural father, that presumption had to be overcome before child support could be recovered from Sasse. The issue was whether the child in that case could be barred from pursuing a claim for child support based on the five-year limitation found at § 40-6-108(1)(b), MCA (1983), when a child to whom no similar presumption applied could bring a cause of action for support until two years after he or she reached the age of majority. In *Sasse*, there was clearly disparate treatment of child support actions based on a child's status as legitimate or illegitimate. Because of that disparate treatment, and because of prior decisions by the United States Supreme Court in *Mills v. Habluetzel* (1982), 456 U.S. 91, 102 S. Ct. 1549, 71 L. Ed. 2d 770, and *Pickett v. Brown* (1983), 462 U.S. 1, 103 S. Ct. 2199, 76 L. Ed. 2d 372, which prohibited discrimination based on illegitimacy pursuant to the Equal Protection Clause, we concluded that an equal protection analysis was necessary. We held that:

> Since the case at bar involves a discriminatory classification based on illegitimacy, it is appropriate for us under *Clark* to examine the equal protection issues here on the level of intermediate scrutiny.

*Sasse*, 801 P.2d at 601.

After balancing the State's interest in the statutory classification against the countervailing interest in requiring

21

proper support for all children, we concluded that disparate treatment of legitimate and illegitimate children did not survive middle-tier scrutiny, and therefore, held that § 40-6-108(1)(b), MCA, was unconstitutional. We did not specify that it was unconstitutional as applied to the facts in that case. However, no other conclusion can be drawn from that opinion. The entire equal protection analysis in that case was based upon the classifications presented by the facts in that case. Furthermore, there was no discussion of facial invalidity, nor any analysis that would be prerequisite to a conclusion of facial invalidity.

This case, on the other hand, presents no disparate treatment of actions to recover child support based on the status of illegitimacy. The issue in this case is simply whether a person who is presumed to be a child's father because the child was born during his marriage to her mother, may be assured that that presumption cannot be challenged after the child's fifth birthday. There are no classifications involved. There is no similar class of presumed parent for children born out of wedlock who could be treated differently than the class to which K.E.V. belongs. This case is controlled by our decision in *Matter of W.C.*

In *Matter of W.C.*, Roger was presumed to be the natural father of Tara because she was born during his marriage to her mother. After the dissolution of that marriage, Wallace filed a petition challenging Roger's parenthood and filed blood test results indicating that he was the child's natural father. The district

22

court held that the petition was barred by § 40-6-108(1)(b), MCA, because it was not filed within five years from Tara's birth. This Court affirmed. In the process, this Court rejected Wallace's assertion that the statute of limitations was rendered unconstitutional by the Supreme Court's equal protection decisions in *Mills* and *Pickett*. We distinguished cases where children's rights to recover child support was affected by their status as legitimate or illegitimate. We held that:

> The deprivation of equality by governmental classification that was present in *Mills* and *Pickett* is absent in the case at bar. . . .
>
> In the present case we are not considering the constitutionality of a statute of limitations that would bar an illegitimate child's right to support. The child herein involved is not illegitimate because respondent has been presumed to be the father in accordance with § 40-6-105(1)(a), MCA. In addition, the action is not being brought on behalf of the minor child and there is no allegation the child is being denied support. The Montana statutes at issue in this case are not unconstitutional under *Mills* or *Pickett* because they do not differentiate between legitimate and illegitimate children. Section 40-6-107(1), MCA. The invidious discrimination discussed in *Mills* and *Pickett* is not present here. Indeed, the Montana statute does not discriminate in any way against the appellant.

*Matter of W.C.*, 671 P.2d at 622-23.

Likewise, § 40-6-108, MCA (1983), did not discriminate in any way against M.L.V. Therefore, she had no standing to challenge the statute on an equal protection basis, and the District Court erred by invalidating the statute on that basis.

For these reasons, I conclude that there has never been a successful facial challenge to the constitutionality of § 40-6-108,

23

MCA (1983); that statute is not unconstitutional as applied to the facts in this case; and M.L.V.'s challenge to K.E.V.'s paternity was barred because it was not brought within five years from the date of their child's birth. I would reverse the District Court's failure to apply the statute of limitations as a bar to M.L.V.'s claim, and I dissent from that part of the majority opinion which affirms the District Court's failure to do so.

_____
Justice

October 25, 1994

### CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


Mark P Yeshe
Attorney at Law
P.O. Box 483
Helena, MT 59624

J. Richard Orizotti, Esq.
Poore, Roth & Robinson, P.C.
1341 Harrison Ave.
Butte, MT 59701



ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _A. Gallagher_
Deputy