185 P.3d 834

**Egan Hajime INOUE, Plaintiff–Appellee,**

v.

**Gina Lenee' INOUE, nka Gina Lenee Khouw, Defendant–Appellant.**

No. 28028.

Intermediate Court of Appeals of Hawai'i.

Jan. 31, 2008.

Robert M. Harris and Sara R. Harvey, on the briefs, for Defendant–Appellant.

A. Debbie Jew (Oliver, Lau, Lawhn, Ogawa & Nakamura), Honolulu, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, C.J., WATANABE and FUJISE, JJ.

Opinion of the Court by RECKTENWALD, C.J.

Defendant–Appellant Gina L. Inoue, now known as Gina L. Khouw (Gina), appeals from the Divorce Decree filed on June 9, 2006 (Divorce Decree), as well as several related orders entered by the Family Court of the First Circuit (family court).[1]

Gina challenges a number of the findings of fact and conclusions of law entered by the family court. Most notably, Gina contends that the family court erred in holding that she was equitably estopped from denying that Plaintiff–Appellee Egan H. Inoue (Egan) was the father of Child One for the purposes of determining custody. Egan was indisputably not Child One's biological father. Gina was pregnant with Child One when she met Egan, and she did not identify him as Child One's father when she first obtained a birth certificate for Child One. However, Gina and Egan subsequently were married, and Gina, with Egan's consent, obtained an amended birth certificate for Child One which identified Egan as Child One's father. Moreover, both Gina and Egan treated Child One as the daughter of Egan. The family court found that Egan was Child One's "legal father," and that Gina was equitably estopped from contending otherwise.

We conclude that the family court was correct in holding that Gina was equitably estopped in the circumstances of this case. Since we find that Gina's other points of error are without merit, we affirm.

## I. Background

Gina met Egan in February 1996, when Gina was pregnant and working at an art gallery. Egan ran a company called Grappling Unlimited, which conducted training seminars and classes on self-defense and fighting.

Child One, a girl, was born on September 11, 1996. Egan went with Gina to her doctor's appointments while she was pregnant, and Egan was present for Child One's delivery. At the time of Child One's birth, Gina and Egan were living in Mililani with Gina's parents, Teri Butera (Teri) and Anthony Butera (Anthony). Gina returned to work when Child One was approximately five weeks old, and Egan assumed child care responsibilities for Child One, including feeding her, bathing her, and putting her to bed. Egan took

1. The Honorable Christine E. Kuriyama presided.

Child One to work with him, where he taught grappling classes while carrying Child One in his left hand. When Egan was not able to watch Child One while he was working, he would take Child One to his parents' house.

Gina did not identify Child One's father on Child One's original birth certificate. At some point after Child One's birth, Child One's birth certificate was changed to reflect Egan as her father.

The new birth certificate bears the same certificate number as the original, as well as the same receipt date, which is identified as September 17, 1996, six days after Child One's birth. While the original certificate did not identify either Child One's "father's name" or "father's race," the new certificate identifies Child One's father as "Egan Hajime Inoue," and her father's race as "Japanese."

The family court did not make any findings about when this change occurred, and neither Gina nor Egan testified at trial about when it occurred. However, Jean Chun (Ms. Chun), a Child Protective Services (CPS) social worker with the Department of Human Services (DHS), investigated Gina's allegations of domestic violence against Egan and testified about statements that Gina made to her about when the birth certificate was changed. Ms. Chun testified, in part, about an entry in her records of investigation as follows:

> Q. [By counsel for Egan] At the top, you indicate that Ms. Inoue stated that she put Mr. Inoue's name on [Child One]'s birth certificate when her daughter was 3 and a half years old. They were not asked questions when they went to the Department of Health, but only told the clerk that they were now married and wanted to put Mr. Inoue on [Child One]'s birth certificate. That's a statement that Mrs. Inoue made to you—
>
> A. That's correct.[2]

Gina and Egan were married on June 8, 1997. A daughter, Child Two, was born on December 30, 1997. Another daughter, Child Three, was born on May 20, 2003. Gina, Egan, and Child One continued to live in Mililani with Gina's parents until shortly after Child Two's birth. Gina, Egan, Child One, and Child Two then moved to live in one half of the duplex house in Mānoa owned by Egan's mother and father, Evangeline Inoue (Evangeline) and Errol Inoue (Errol). They continued to live in the duplex until Gina and Egan separated.

While living in Mānoa, Gina and Egan shared child care responsibilities for the three girls with Evangeline and Errol. Both sets of grandparents attended the children's school functions. Child One and Child Two participated in a number of extracurricular activities. Egan chose the children's pediatrician and participated in their medical care.

Egan established education accounts for Child One and Child Two. According to Egan, he gave Gina $1,000.00 of prize monies from each of his fights, to be evenly split between the accounts for Child One and Child Two. During the period of separation before the Divorce Decree, Gina withdrew funds from these accounts.

Egan began working for Merck Pharmaceuticals in 2002, and subsequently met Marsia Damas (Marsia) on an airplane during a business trip. In about September 2003, their relationship "got [a] little more serious" and Marsia joined Egan on a trip to Thailand.

On October 26, 2003, Gina and Egan had an argument about Egan wearing a shirt that Marsia had given him. Gina attempted to prevent Egan from leaving their Mānoa home by blocking the doors as Egan tried to exit the house. Egan held Gina against a wall to avoid being hit or kicked by her. During this argument, Gina fell to the floor. According to Gina, Egan "squeezed" her throat during the argument. Gina testified that she felt dizzy and that after Egan stopped squeezing her throat, she crawled to the kitchen area where she laid on the floor.

---

2. In contrast to the timing reflected in Ms. Chun's testimony, Gina stated in several affidavits in support of pre-trial motions that "[Gina] did put [Egan] on the birth certificate when [Child One] was about a year old so that all the children would have the same name as [she has] and the other children have," and that "[Gina] did add [Egan] to the birth certificate after [Egan] and [she] were married and [she] was pregnant with [Child Two]." However, the affidavits were not admitted into evidence at trial.

Egan denied causing Gina to fall to the floor and testified that Gina would frequently drop to the floor, start crying, and go into a fetal position as a "tactic" to prevent him from leaving the house when they argued.

After checking on Gina, Egan left. Gina then called her parents and told them that Egan had assaulted her. Neither Gina nor her parents called the police that night, nor did Gina's parents go to Mānoa to help Gina that night.

On the following day, October 27, 2003, Gina took $12,000.00 from the couple's home safe and left the residence with Child Three. After withdrawing an additional $24,500.00 from a joint savings account, Gina retained the services of an attorney, visited with her parents, then called the police and reported Egan for domestic violence. That same day, Gina filed an Ex Parte Motion for Temporary Restraining Order (TRO) and obtained a TRO against Egan. During a November 6, 2003 hearing on the TRO, Egan denied Gina's allegations of abuse. Egan did, however, agree to the entry of an Order for Protection without findings. According to Egan, he did this because the TRO also prohibited Gina from contacting him and he did not trust her because of her false allegations.

Gina's allegations of domestic abuse on October 26, 2003, resulted in criminal proceedings against Egan. Egan was found not guilty on all charges. On December 2, 2003, Egan filed a motion to dissolve the TRO because Gina used the TRO to prevent Egan from participating in Child One and Child Two's school events.

Ms. Chun, the CPS social worker, testified that on November 7, 2003, Child One's "paternal grandmother" reported to the DHS that Child One had bruises on her arm. Ms. Chun did not see or interview Child One and Child Two until December 1, 2003, and at that time did not observe bruises on Child One, but she acknowledged that any evidence of bruising may have been "gone" by that time.

At the December 1, 2003 interview of the children, Child Two told Ms. Chun that "dad chokes mom, he hits mom with his fist, hitting her on the calf." Child One told Ms. Chun that "her parents yell at each other

and dad tried to choke mom one time." Child One told Ms. Chun that she had not seen any hitting or pushing between her parents, but "shared that [Egan] threw [Child One] across the room once when [Child One] was 4 years old, she landed on the couch."

On May 4, 2004, Child Two told Ms. Chun that Egan disciplines her by talking to her, not hitting her or choking her, but that Gina disciplines by hitting her, choking her, and slapping her on the cheek. Ms. Chun testified that what the children told her in the December 1 interview "was closer to the truth" because she felt "that the children were not prepared for [the] interview, that they were more relaxed, that they were more open to talking about the family situation." By the time of the May 4 interview, however, Ms. Chun testified that "the children were very enmeshed in what was going on, and they seemed to reflect the attitudes ... of the parent bringing them into the office."

Ms. Chun further testified that she was not aware, at the time of the December 1, 2003 interview with Child One and Child Two, that Gina had custody of the two girls on November 7, 2003, when the bruises were observed by Child One's paternal grandmother. She testified that she did not know that there was a restraining order against Egan on December 1, 2003, but also admitted that the November 8, 2003 intake report mentioned a restraining order.

Ms. Chun testified that she was "very concerned there was domestic violence in [Gina and Egan's] relationship" and that "if [Gina and Egan] had not been separated, the [DHS] may have taken further steps" in its investigation. However, "what [Ms. Chun] saw was influence of the parents and the pattern of the children's information reflected the parents' position very clearly, and at that point [Ms. Chun] stopped interviewing the children because—or further investigating because [she] felt there would be emotional harm to the children if [Ms. Chun] picked up with each allegation and tried to go through with it. It was very clearly a custody battle."

Ms. Chun "spent a lot of time, particularly with [Egan]" discussing the emotional harm

to Child One and Child Two caused by the custody dispute. She testified that she met with Gina once and Gina "was a little more focused on the children and their needs, a little better able to pick up on what needed to be done[.]" According to Ms. Chun, she did not investigate each accusation between Egan and Gina, but "assess[ed] the children to be safe[,]" and without further action, closed the case.

Malia Taum was appointed as the Guardian Ad Litem for Child One, Child Two, and Child Three. According to Ms. Taum, her investigation included receiving a report from DHS indicating "no confirmed threats or confirmed allegations of abuse to the children or either parent."

In June, 2004, Teri and Anthony moved to Houston, Texas. Gina decided to move to be closer to Teri and Anthony, and Gina and her new partner Marcel Khouw (Marcel) purchased a condominium next door to her parents' residence. Gina now has a child with Marcel.

Dr. Marvin Acklin (Dr. Acklin), custody evaluator, testified that Egan is Child One's "psychological father," although Child One is now aware that she is not Egan's biological child. Dr. Acklin recommended that Child One, Child Two, and Child Three not relocate from Hawai'i to Houston, Texas as Gina had planned because "Child Three is ... an infant, and the—an infant's developmental capacities don't permit long-distance parenting, unless it's saturated, and extremely expensive." Dr. Acklin also testified that he did not recommend that the children move to Houston because "given these children's age, a relocation would have a negative impact on the father/child relationship."

On June 9, 2006, the family court issued the Divorce Decree, awarding Egan sole legal and physical custody of Child One, Child Two, and Child Three, and awarding visitation to Gina. The Divorce Decree provides for two different living situations:

III. *CHILD RELATED ISSUES*

....

B. *VISITATION IF BOTH PARENTS LIVE IN THE SAME LOCALE.*

For as long as both parents live in the same locale and within reasonable proximity of each other and a child is at least three years old, [Gina] shall have the following visitation with those children who are at least three years old:

1. *Alternate Weekends.* The children shall spend alternate weekends with each parent, ... Until [CHILD THREE] is three years old, [Gina] shall have visits with [CHILD THREE] from 9:00 a.m. to 6:00 p.m. on Saturday and Sunday on the same alternate weekends as [CHILD ONE] and [CHILD TWO].

2. *Midweek.* [Gina] may also visit with the children on Tuesdays from after school until 6:00 p.m.

3. *Christmas Vacation.* [Egan] and [Gina] shall share equally the children's Christmas school break each year. . . .

4. *Summer Vacation.* During the summer vacation, [Egan] and [Gina] shall share equally the summer vacation. . . .

5. *Spring Vacation.* [Egan] and [Gina] shall share equally the spring vacation. . . .

6. *Vacations with the Children.* For each calendar year, [Egan] and [Gina] shall each be entitled to have up to two consecutive weeks of vacation with the children in order to allow for extended travel away from Oahu. Such extended vacations shall occur during the children's vacations from school. . . .

....

14. The parent who has the children shall be responsible for taking the children to and from school, and for ensuring that the children complete homework assignments, if any, and for taking the children to and from extracurricular activities in which the children are enrolled and/or participate. . . .

C. *VISITATION IF BOTH PARENTS LIVE IN DIFFERENT LOCALES.*

During periods when parties reside in different locales, [Gina] shall have visitation as follows:

1. *Christmas Vacation.* [Gina] shall have visitation with the children for all but the last two days of every other Christmas vacation, in the odd-numbered years.

2. *Spring Vacation.* [Gina] shall have visitation with the children for all of every other spring vacation in the odd-numbered years.

3. *Summer Vacation.* [Gina] shall have visitation with the children for up to one-half of the summer. At a minimum, visitation with the children shall end seven (7) days prior to the beginning of the school year.

4. *Special accessibility.* [Gina] shall have visitations with the children during those periods when she travels to the locale in which the children reside provided that she gives at least two weeks notice prior to such visitation. Such visitation shall take into account the children's usual schedule. If [Gina] is at the children's locale for less than seven (7) days, she shall arrange with [Egan] such non-overnight visit(s) which considers the children's activities and schedule. If [Gina] is at the children's locale for seven (7) days or greater, then[ ] [Gina] shall have such visitation during the midweek and alternate weekend(s) as provided in section III.B.

On July 7, 2006, Gina filed a notice of appeal from: (1) the Divorce Decree, (2) the Order Re: Trial filed March 14, 2006,[3] and (3) the "Order Re: Defendant's Motion for New Trial, Reconsideration, Alteration and/or Amendment of Order filed March 14, 2006; filed on March 24, 2006," filed June 2, 2006.[4] On August 31, 2006, the family court issued its Findings of Fact (FsOF) and Conclusions of Law (CsOL) and Order.

## II. Points of Error

Gina raises a number of points of error, which we discuss in detail below. In summary, Gina contends that:

(1) The family court erred in concluding that Egan was the legal father of Child One and that Gina was equitably estopped from contending otherwise.

(2) The family court erred in holding that Egan did not abuse her or their children.

Gina challenges several findings of fact relating to this issue, and also challenges rulings by the family court excluding evidence of statements that Gina made to police concerning alleged domestic violence by Egan.

(3) The family court incorrectly applied the "best interests of the child" standard in determining custody. Gina contends that since this was a case involving domestic violence, there should have been a presumption against awarding custody to Egan. Moreover, with regard to Child One, Gina argues that Egan could not be awarded custody in any event because he was not Child One's legal father and Gina was not unfit and had not abandoned Child One.

(4) The family court improperly applied a presumption in favor of granting custody to Egan because he is a Hawai'i resident.

## III. Standards of Review

### A. Findings of Fact and Conclusions of Law

■ In this jurisdiction, a trial court's [FsOF] are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed.

*Chun v. Bd. of Trustees of the Employees' Retirement Sys. of the State of Hawai'i,* 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005), *reconsideration denied,* 106 Hawai'i 477, 106 P.3d 1120 (2005) (internal quotation marks, citations, and ellipses omitted) (quoting *Allstate Ins. Co. v. Ponce,* 105 Hawai'i 445, 453, 99 P.3d 96, 104 (2004)).

■ "An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to sup-

---

3. The March 14, 2006 order granted the divorce and awarded Egan sole legal and physical custody of the three children subject to Gina's rights of reasonable visitation.

4. The June 2, 2006 order denied Gina's motion for a new trial, as well as her requests for recon-

sideration of the custody and visitation order and for clarification of the court's order regarding domestic violence, and granted Gina's request for reconsideration of the calculation of child support.

port a conclusion." *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (internal quotation marks and citations omitted) (quoting *State v. Kotis*, 91 Hawai'i 319, 328, 984 P.2d 78, 87 (1999)).

A COL is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

*Chun*, 106 Hawai'i at 430, 106 P.3d at 353 (internal quotation marks, citations, and brackets omitted) (quoting *Allstate Ins. Co. v. Ponce*, 105 Hawai'i at 453, 99 P.3d at 104 (2004)).

## B. Evidentiary Rulings

■ "We apply two different standards of review in addressing evidentiary issues. Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (internal quotation marks and citations omitted).

## IV. Discussion

### A. The family court did not err in concluding that Egan was Child One's "legal father," and that Gina was equitably estopped from contending otherwise.

Gina argues that FOF 2(a) is clearly erroneous, and CsOL 3, 4, and 7 are wrong.

FOF 2(a) states:

Egan and Gina are the parents of three minor children. The Certification of Live Birth issued by the State of Hawaii for each child indicate the following:

(a) [CHILD ONE] was born on September 11, 1996 in the County of Honolulu. Mother's Maiden Name is Gina Lenee' Butera. The initial Certification of Live Birth did not identify a father for

[Child One]. Gina, with Egan's consent, arranged for another Certification of Live Birth to be issued which identified Father's Name as Egan Hajime Inoue. The second Certification of Live Birth indicated that the date accepted by the State Registrar was September 17, 1996.

COL 3 states:

Under H.R.S. § 338–17.7(b), "[w]hen a new certificate of birth is established under this section, it shall be substituted for the original certificate of birth." H.R.S. § 338–12 states that "Data pertaining to the father of a child is prima facie evidence if: (1) The alleged father is: (A) The husband of the mother; or (B) The acknowledged father of the child. . . . Data pertaining to the alleged father acknowledging paternity of the child is admissible as evidence of paternity in any family court proceeding, including proceedings under chapter 584."

COL 4 states:

The Court finds and concludes that upon the issuance of the original Certification of Live Birth which was accepted by the State Registrar on September 17, 1996, Egan is [Child One]'s legal father and her legal name is [Child One] Inoue.

COL 7 states:

The Court finds and concludes that Gina is estopped for [sic] asserting that Egan is not the father of [Child One]. Gina undertook efforts to change the Certificate of Birth to reflect that Egan was [Child One]'s father, and that [sic] Gina and Egan treated [Child One] as the daughter of Egan. Gina represented to Egan that he had adopted [Child One], and that they would not have to go to court for an adoption.

Gina argues that issuance of the new birth certificate identifying Egan as Child One's father "did not and could not legally establish parentage." Gina argues that Egan's parentage could only have been established pursuant to the procedures set forth in Hawaii Revised Statutes (HRS) Chapter 578 and 584, but "there was never an adjudication of Egan's parentage[,]" and the family court did not expressly find that Egan was Child One's

father pursuant to any provision of HRS chapter 584. Although Gina concedes that pursuant to HRS § 338–12 the birth certificate constitutes "*prima facie* evidence of parentage if the alleged father is the husband of the mother, or the acknowledged father, or a father whose paternity was established pursuant to HRS Chapter 584[,]" Gina argues that the *prima facie* evidence in this case was rebutted by evidence which "overwhelmingly established that Egan was not [Child One]'s birth father." Gina argues that the family court's conclusion "that parentage was established by estoppel" was wrong because "[t]he concept of equitable parenthood has been consistently rejected in most instances where it has been raised." Lastly, Gina argues that "the evidence failed to establish grounds to support a conclusion that equitable or promissory estoppel applied."

 We conclude that the family court did not err in holding that Egan is Child One's "legal father," and that Gina is estopped from challenging Egan's parentage of Child One. Pursuant to HRS § 584–4 (Repl. 2006), Egan and Child One have a presumptive "parent and child relationship." HRS Chapter 584 discusses how a parent-child relationship may be established, and states in relevant part:

§ 584–1 **Parent and child relationship defined.** As used in this chapter, "parent and child relationship" includes the legal relationship existing between a child and the child's natural mother, between a child and father whose relationship as parent and child is established under this chapter, or between a child and the child's adoptive parents, incident to which the law confers or imposes rights, privileges, duties, and obligations.

§ 584–3 **How parent and child relationship established.** The parent and child relationship between a child and:

. . . .

(2) The natural father may be established under this chapter[.]

. . . .

§ 584–4 **Presumption of paternity.** (a) A man is presumed to be the natural father of a child if:

. . . .

(3) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and:

. . . .

(B) With his consent, he is named as the child's father on the child's birth certificate; or

. . . .

(4) While the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child;

. . . .

(b) A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court decree establishing the paternity of the child by another man.

§ 584–12 **Evidence relating to paternity.** Evidence relating to paternity may include:

. . . .

(7) All other evidence relevant to the issue of paternity of the child.

Gina does not contest that she and Egan married after Child One's birth, and that, with Egan's consent, she had Child One's birth certificate changed to identify Egan as Child One's father. Once Egan and Gina were married and the birth certificate was amended, Egan was Child One's "presumed . . . natural father." HRS § 584–4(a)(3). Additionally, there is substantial evidence that while Child One was under the age of majority, Egan received her into his home and openly held out Child One as his natural child. HRS § 584–4(a)(4). Egan and Child One therefore have a presumptive "parent and child relationship" incident to which "the law confers or imposes rights, privileges, duties, and obligations." HRS § 584–1.

Gina argues that COL 7, in which the family court concluded that "Gina is estopped

for [sic] asserting that Egan is not the father of [Child One,]" is incorrect because "a legal-parent-child relationship cannot be established by estoppel." However, Gina reads the conclusion of the family court too broadly. The family court did not use estoppel to bestow parental rights and duties on a legal stranger to Child One. Rather, the family court ruled that Gina was estopped from challenging Egan's legal status as Child One's presumed natural father.

Moreover, HRS Chapter 584 does not preclude the use of equitable estoppel as a defense to bar a mother from challenging the paternity of a presumed natural father. In *Doe v. Doe*, 99 Hawai'i 1, 52 P.3d 255 (2002), the plaintiff-appellant Mother gave birth to a Daughter and Son during the course of her marriage to the Presumed Father. *Id.* at 2, 52 P.3d at 256. Mother and Presumed Father then divorced pursuant to a divorce decree which stated that Daughter and Son were "the issue of this marriage," awarded physical custody to Mother and visitation rights to Presumed Father, and ordered Presumed Father to pay child support. *Id.* at 3, 52 P.3d at 257. Two years after entry of the divorce decree, Mother filed a "Petition for Paternity, Custody, and Other Relief," pursuant to HRS Chapter 584, asserting that another man, Alleged Father, was Son's natural father, and seeking, *inter alia,* "an order for genetic testing of Alleged Father, Mother and Son," "a judgment establishing Alleged Father as Son's natural father," orders awarding visitation rights to Alleged Father, and "orders requiring Alleged Father to pay child support." *Id.* Both Alleged Father and Presumed Father asserted defenses of res judicata and estoppel. *Id.*

The Hawai'i Supreme Court stated that "the enactment of chapter 584 ... does not prevent a proper litigant in a paternity action

from asserting defenses based upon res judicata and equitable estoppel, and a final judgment—including a divorce decree—can serve as the basis for such defenses." *Id.* at 13, 52 P.3d at 267. The court also stated that "[n]othing in [HRS Chapter 584] displaces common law doctrines of preclusion and estoppel any more than any other claim for relief...." *Id.* at 5, 52 P.3d at 259.[5]

Courts in other jurisdictions have applied equitable estoppel to preclude a mother from challenging the presumptive paternity of a father in the context of a divorce proceeding even where clear and convincing evidence indicated that the presumed father was not, in fact, the biological father. In *Pettinato v. Pettinato*, 582 A.2d 909 (R.I.1990),[6] Mother gave birth to Son, and married Presumed Father a year later. *Id.* at 911. Presumed Father testified that Mother informed him that he was Son's father when she called to tell him that she was pregnant, and that he did not learn of Mother's denial of his paternity until the time of the divorce action. *Id.* Although Mother claimed she told Presumed Father he was not in fact the father of Son while Mother was still in the hospital after giving birth, the Supreme Court of Rhode Island rejected that claim and found:

> [Presumed Father] married [Mother], believing her representation that the child was his child. He married her with the intention that the couple would raise their child in a family unit. [Presumed Father] consented to being named as the father on [Son's] birth certificate. The three lived together and represented themselves to the community as a family. [Mother] never questioned [Presumed Father's] paternity until after he commenced divorce proceedings that followed her leaving him.

*Id.* at 913.

At the hearing on the divorce action, and over the objections of Presumed Father, the

---

5. The court did not reach the issue of whether Mother was in fact equitably estopped from challenging Presumed Father's paternity. The court resolved the case on issue preclusion grounds, finding that a divorce decree is a "final judgment" rather than an "agreement" pursuant to HRS § 584-6(c). *Doe,* 99 Hawai'i at 7, 52 P.3d at 261.

6. *Pettinato* was cited by the Hawai'i Supreme Court in *Doe, supra,* as supporting the proposi-

tion that "[the] conclusion that an individual can be precluded or estopped from relitigating the issue of paternity on the basis of a previous judgment is consistent with the case law in nearly every other jurisdiction that has adopted the [Uniform Parentage Act]," *Doe,* 99 Hawai'i at 6, 52 P.3d at 260, although in *Pettinato,* Mother was precluded from disestablishing paternity of Presumed Father on grounds of equitable estoppel rather than issue preclusion, 582 A.2d at 912–13.

family court heard expert testimony that a genetic test revealed that Presumed Father could not be Son's biological father. *Id.* at 911. The family court nevertheless awarded Presumed Father permanent custody of Son, subject to reasonable rights of visitation for Mother. *Id.* The family court "based the award on the care given [Son] by [Presumed Father], the length of time [Son] spent with [Presumed Father], and the bonding that had occurred between [Son] and [Presumed Father]." *Id.* Mother appealed, arguing, *inter alia,* that "the trial justice improperly overlooked and/or misconceived the expert testimony regarding the genetic blood testing that excluded [Presumed Father] as the biological father of [Son,]" and that "as the natural parent of [Son], she is entitled to custody of the child absent a showing of unfitness." *Id.* at 912.

Similar to *Doe,* Presumed Father was Son's "presumed natural father" under Rhode Island General Laws 1956 (R.I. Gen. Laws) § 15–8–3(a)(3)(ii) (1988 Reenactment), which was in substance identical to HRS § 584–4(a)(3)(B) (Repl.2006). *See id.* at 912. Although it was undisputed that Presumed Father had married Mother after Son's birth, and with his consent had been named as Son's father on Son's birth certificate, Mother claimed the results of the genetic test excluding Presumed Father as Son's natural father provided "clear and convincing" evidence pursuant to R.I. Gen. Laws § 15–8–3(b) (1988 Reenactment) [7] which rebutted the presumption of Presumed Father's paternity. *Id.* at 912.

The court in *Pettinato* rejected Mother's contention that the family court overlooked and/or misconceived the expert testimony regarding the genetic testing, and held:

> We are of the opinion that a mother should be equitably estopped from using the genetic blood testing permitted by § 15–8–11 to disestablish a child's paternity in connection with a routine divorce proceeding. The underlying rationale of the equitable-estoppel doctrine is that "under certain circumstances, a person might be estopped from challenging paternity where that person has by his or her conduct accepted a

given person as father of the child." *John M. v. Paula T.,* 524 Pa. 306, 318, 571 A.2d 1380, 1386 (1990). Where the equitable-estoppel doctrine is operative, evidence of genetic blood tests is considered irrelevant in a divorce proceeding wherein the basic issue is the termination of the marriage bond-not the paternity of a child. "[T]he law will not permit a person in these situations to challenge the status which he or she has previously accepted [or created]." *Id.*

*Id.* at 912–13.

The court further held:

> Taken together, this court's adherence to the statutory presumption of paternity in § 15–8–3(a)(3)(ii) and the court's application of the equitable-estoppel doctrine lead to the same point: the genetic blood test results offered into evidence were not relevant because legal paternity had been established and biological paternity was not at issue.

*Id.* at 913 (internal citation omitted).

Thus, the Supreme Court of Rhode Island applied equitable estoppel to preclude Mother from using "clear and convincing" evidence that Presumed Father was not Son's biological father to disestablish Son's paternity because Mother had, by her conduct, accepted Presumed Father as Son's father. On virtually identical facts, the Supreme Court of Kentucky reached the same result in *Hinshaw v. Hinshaw,* 237 S.W.3d 170, 171 (Ky.2007) ("This Court holds today that the common law doctrine of equitable estoppel is applicable to custody cases."); *see In re Marriage of K.E.V.,* 267 Mont. 323, 883 P.2d 1246, 1252–53 (1994) (equitable estoppel barred mother from rebutting presumed father's paternity in a divorce proceeding, where mother told presumed father he was the biological father, and presumed father detrimentally relied on that misrepresentation).

Similarly here, we conclude that the family court did not err in holding that Egan is Child One's "legal father," and that the doctrine of equitable estoppel could be applied to prevent Gina from challenging Egan's parentage of Child One. Although *Pettinato*

---

7. R.I. Gen. Laws § 15–8–3(b) (1988 Reenactment) was in substance identical to HRS § 584– 4(b) (Repl.2006). *See Pettinato,* 582 A.2d at 912.

involved a representation made by the mother to the presumed father regarding whether he was the biological parent of the child, whereas the instant case involves a representation made by Gina to Egan regarding the legal effect of changing the birth certificate to reflect Egan as Child One's father, we see no reason to distinguish the cases.

Gina next argues that "the evidence failed to establish grounds to support a conclusion that equitable or promissory estoppel applied." Gina argues that (1) she "did not act apart from Egan in obtaining the Amended Birth Certificate[,]" (2) the evidence did not establish that she represented to Egan that by obtaining the new birth certificate, no further legal action was required by Egan to adopt Child One, and (3) that "Egan clearly did not rely, reasonably or otherwise, on any statements allegedly made by Gina in regard to his not needing to do anything to adopt [Child One.]"

■ In Hawai'i, "[t]he material elements of equitable estoppel require one person to wilfully cause another person to erroneously believe a certain state of things and the other person to reasonably rely on his or her erroneous belief to his or her detriment." *Jackson v. Jackson*, 84 Hawai'i 319, 337–338, 933 P.2d 1353, 1371–72 (App.1997) (quoting *Aehegma v. Aehegma*, 8 Haw.App. 215, 223, 797 P.2d 74, 80 (1990)).

Applying these principles here, we conclude that the family court did not err in holding that Gina was equitably estopped from denying that Egan was the father of Child One. Gina concedes that, with Egan's consent, she obtained a new certificate of birth identifying Egan as Child One's natural father. Egan testified as follows about his understanding of the effect of changing the birth certificate to identify him as Child One's natural father:

Q. [By Counsel for Egan] Now, you're listed as [Child One]'s dad.

A. Yes.

Q. What did Gina tell you was the effect of having you listed as [Child One]'s dad on her birth certificate?

A. That I—to be on the birth certificate, I'd have—I'd have to adopt her.

Q. You have adopted her by virtue of the fact that you're on the gift—

A. Yes.

Q. —birth certificate? Have you—I mean how have you treated [Child One] in terms of her being your child? Did you treat her differently, or do you treat her as if she were your biological child?

A. No, I treat her as if she was my own biological child.

Teri, Gina's mother, also testified regarding Egan's understanding of the effect of changing Child One's birth certificate to reflect him as Child One's natural father:

Q. [By counsel for Gina] Did you ever have a discussion with Egan regarding his name being put on [Child One]'s birth certificate?

A. The—I did talk to him at the house once. He was bragging saying that he didn't have to—he didn't have to adopt her, he didn't have to pay any money, all he had to do was lie and sign a paper.

Q. So ... was he clear to you that he knew he had not adopted her?

A. Oh, yes, definitely.

COL 7 states that "Gina represented to Egan that he had adopted [Child One], and that they would not have to go to court for an adoption." Gina argues that Egan's testimony in fact suggested that he knew that he still "would have to adopt [Child One]—not that he had adopted her." However, we believe the more plausible interpretation is that Egan understood that he had adopted Child One by putting his name on her birth certificate, and accordingly, Egan's testimony provides substantial evidence to support COL 7. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Even if Teri's testimony suggests that Egan did not believe that he had adopted Child One,[8] the family court, as the

---

**8.** Although Gina suggests that Teri's testimony establishes that Egan knew that he had not adopted Child One, the testimony can also be interpreted as suggesting that Egan believed that he did not have to initiate *formal* adoption proceedings because his name was on the birth certificate. Under this interpretation, Teri's testimony is consistent with COL 7.

trier of fact, was free to reject that testimony in whole or in part and to credit the testimony of Egan. *In re Jane Doe*, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001).

The record also establishes that Egan reasonably relied to his detriment on Gina's representation that he was adopting Child One by placing his name on Child One's birth certificate. Egan testified that he treated Child One the same as his other children. Gina does not contest the following findings of fact:

5) Prior to separation, Gina considered Egan to be "the best dad", "better than any dad", and "the children's biggest buddy".

6) Egan was involved in the daily care of the children. Egan provided care for the children while Gina attended school and/or worked until he obtained his position with Merck....

7) Prior to separation, the children spent holidays and established many traditions with the Inoue family....

8) Egan segregated funds from his winnings as a professional fighter to establish education accounts for [Child One] and [Child Two]....

....

12) ... Egan initially contacted Dr. Suh ... to be the pediatrician for the children. Egan fully participated in the children's medical care....

....

24) After separation, Egan established routines for the children including time spent with his parents, to whom the children had established an extremely close relationship. Egan incorporated family time, school work and homework time, meal preparation, and religion into the children's routine when they are with him. While in Egan's custody, the children continued many of the family traditions which they enjoyed prior to separation.

Moreover, Gina held herself, Egan and the three girls out to the community as a family. In a media interview in August or September of 2003, Gina said "we have three daughters.... [Child One] is the oldest." She

went on to describe Egan's relationship with Child One as follows:

Egan's the best dad. He—he's better than any dad I've ever seen on TV. He's better than any dad I've ever seen since [Child One] was born. He—he went to every doctor's appointment with me when I was pregnant with [Child One]. He was there through the whole thing, the delivery. I went back to work right away after her, and he took her to the gym. He taught class carrying her when she was only six weeks old. He's the one that decided she needed to be on the regular food first and just said, wow, she—she loves this food, I gave her this, and had baby food all over her face and he said it for the first time. And [Child One], he took her to her first super brawl when she was only three months old, and he was carrying her in the palm of his hand. And so he's been through it all.

In short, the record establishes that Egan acted as a father to Child One from the time of her birth, and that Gina held Egan out to the community as Child One's father. The record does not establish precisely when Gina spoke to Egan about the effect of adding his name to Child One's birth certificate,[9] nor does it suggest that Egan treated Child One any differently after he had that discussion with Gina. Nevertheless, we conclude that the family court correctly determined that there was detrimental reliance by Egan in these circumstances. The analysis of the Kentucky Supreme Court in *Hinshaw* is instructive on this point. In that case, the mother, Jacqueline, and presumed father, Ren, were married in December 1988. 237 S.W.3d at 171. Jacqueline gave birth to a son, Asher, in June 1999. *Id.* Ren was present in the delivery room, and was listed on the birth certificate as Asher's father. *Id.* Until she filed for divorce in 2003, "Jacqueline had always represented, both to Ren and the world, that Ren was Asher's father." *Id.* at 172. During the divorce proceedings, Jacqueline denied that Ren was Asher's father, and the court ordered DNA testing which confirmed that he was not. *Id.* at 171.

9. Based on Ms. Chun's testimony about her discussion with Gina about obtaining a new birth certificate for Child One, *see* section I *supra,* presumably it was no later than 3 1/2 years after Child One's birth.

The Kentucky Supreme Court, citing *Pettinato*, held that Jacqueline was equitably estopped from denying that Ren was Asher's father. *Id.* at 174. In reaching that conclusion, it addressed Jacqueline's argument that Ren had failed to establish detrimental reliance because "Ren testified he would not have done anything differently in his relationship with Asher had he known the truth." *Id.* at 173. The court observed:

> We believe Jacqueline's argument misses the point. Saying Ren would have continued his relationship with, and support for, Asher had he known the truth is not the same as saying he would have taken no action. Jacqueline's actions withheld the true state of affairs from Ren. In so doing, Jacqueline denied Ren the opportunity of seeking legal advice as to the true nature of his relationship with Asher and his rights and obligations in relation to Jacqueline and the biological father. Stated another way, Jacqueline's acts, language, and silence ensured that Ren would take no action. Under these circumstances, we conclude it was not an abuse of discretion for the family court to find Ren relied on Jacqueline's conduct to his detriment.

*Id.* (footnote omitted); *see also In re Marriage of K.E.V.*, 267 Mont. 323, 883 P.2d 1246, 1253 (1994) ("The term 'detrimental' as used in the context of these proceedings means that K.E.V. has been required to respond to M.L.V.'s self-serving proof that he is not K.R.V's biological father.").

The analysis of *Hinshaw* is persuasive here. By representing to Egan that he had adopted Child One, Gina "ensured that [Egan] would take no action" to further investigate or establish his status as Child One's father. *Hinshaw*, 237 S.W.3d at 173. In reaching this conclusion, we note that in child custody cases in other jurisdictions, "courts [are] more inclined to impose equitable estoppel to protect the status interests of a child in an already recognized and operative parent-child relationship." *Matter of Baby Boy C.*, 84 N.Y.2d 91, 102 n. 1, 638 N.E.2d 963, 968 n. 1, 615 N.Y.S.2d 318, 323 n. 1 (1994). We think that is a legitimate consideration, which weighs in favor of finding that the elements of equitable estoppel are present here. As the family court found in COL 5, "Egan was and is [Child One]'s psychological father.... [Child One] views Egan as her father and does not know or recognize any other father." [10]

In sum, we conclude that the family court did not err in finding that the elements of equitable estoppel were established in the circumstances of this case, and that Gina was therefore estopped from challenging Egan's legal status as Child One's presumed father.

■ There is, however, one additional issue to consider. Although not included in her points of error on appeal, Gina argues in her opening brief that "[t]he award of custody of [Child One] to Egan violated Gina's fundamental liberty interest as protected by the Due Process clauses of the United States and Hawai'i State constitutions." Gina provided no citations to indicate "where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the trial court," and has otherwise failed to comply with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4) with regard to this issue.[11]

---

10. Gina challenges COL 5 by suggesting that the family court "was wrong in concluding that psychological parentage established legal paternity." However, Gina misconstrues the family court's conclusion. The family court did not conclude that psychological parentage established legal paternity. Rather, the family court considered it as a factor in determining the applicability of equitable estoppel and in assessing the best interests of Child One. Moreover, there is substantial evidence in the record supporting the family court's conclusion that Egan was Child One's "psychological father."

11. HRAP Rule 28(b)(4) provides in relevant part:
 **BRIEFS.**
 ....

(b) Opening brief. Within 40 days after the filing of the record on appeal, the appellant shall file an opening brief, containing the following sections in the order here indicated:
....
.(4) A concise statement of the points of error set forth in separately numbered paragraphs. Each point shall state: (i) the alleged error committed by the court or agency; (ii) where in the record the alleged error occurred; and (iii) where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency.
....
Points not presented in accordance with this section will be disregarded, except that the

Because Gina failed to comply with HRAP Rule 28(b)(4), we review only for plain error. We conclude that there was none. In *Rubano v. DiCenzo*, 759 A.2d 959 (R.I.2000), the Rhode Island Supreme Court considered a constitutional challenge to the estoppel doctrine that it had recognized in *Pettinato*. The plaintiff in *Rubano* was the former same-sex domestic partner of the defendant, who was artificially inseminated and gave birth to a child during their relationship. *Id.* at 961. They raised the child together for four years, when they separated and DiCenzo moved from Massachusetts to Rhode Island. *Id.* After a conflict arose between them about visitation, they entered into a consent order which allowed Rubano to have "permanent visitation with the child" in exchange for giving up any claim to recognition as a parent of the child. *Id.* at 962. That order contained a recital that the parties agreed that the visitation provisions were "in the best interest of the minor child." *Id.* A subsequent conflict arose, and DiCenzo then argued that the family court had lacked jurisdiction to enter the consent order. *Id.* at 963.

The Rhode Island Supreme Court rejected that argument and held that the family court had jurisdiction to enter and to enforce the order. *Id.* at 977. In reaching that conclusion, the court acknowledged that DiCenzo had a constitutionally protected liberty interest to make decisions concerning the care, custody and control of her child. *Id.* at 972–73 (citing *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)).[12] However, it went on to observe:

> DiCenzo's constitutional rights as the child's natural mother to superintend his future upbringing and his associations with adults other than DiCenzo are not absolute. By her conduct in allowing Rubano to assume an equal role as one of the child's two parents, and by her conduct in agreeing to and signing an order that granted Rubano "permanent visitation" rights with the child because it "is in the best interests of the minor child" to do so, DiCenzo rendered her own parental rights with respect to this boy less exclusive and less exclusory then [sic] they otherwise would have been had she not by word and deed allowed Rubano to establish a parental bond with the child and then agreed to allow reasonable visitation. Cf. *Pettinato*, 582 A.2d at 913 (holding that a mother who, by her conduct, had acknowledged a person to be the child's parent, was equitably estopped from challenging "the status which he or she has previously accepted [or created]") (quoting *John M. v. Paula T.*, 524 Pa. 306, 571 A.2d 1380, 1386 (1990)). Under these circumstances, we do no violence to DiCenzo's constitutional rights when we hold that *Pettinato's* estoppel doctrine precludes her from denying the existence of a "presumption [of parental rights] that she helped to bring about." 582 A.2d at 912.

*Id.* at 976 (brackets in original).

The reasoning of *Rubano* is persuasive here. By marrying Egan and then adding his name to Child One's birth certificate, Gina created the circumstances under which Egan became Child One's "legal father."[13]

appellate court, at its option, may notice a plain error not presented.

**12.** The Hawai'i Supreme Court has recognized that "independent of the federal constitution, ... parents have a substantive liberty interest in the care, custody and control of their children protected by the due process clause of article 1, section 5 of the Hawai'i Constitution." *In re Doe*, 99 Hawai'i 522, 533, 57 P.3d 447, 458 (2002).

**13.** There is a compelling state interest in legitimizing children, which is reflected in HRS chapter 584. *See Doe v. Doe*, 99 Hawai'i 1, 8, 52 P.3d 255, 262 (2002) (the purpose of chapter 584 "is to ensure that every child, to the extent possible, has an identifiable legal father"); *In re Marriage of K.E.V.*, 267 Mont. 323, 883 P.2d 1246, 1250–51 (1994) ("[T]he presumption of legitimacy of a child born during a marriage is one of the strongest and most persuasive known to the law."). That interest provides an additional reason why the application of equitable estoppel to Gina—who is trying to deny that Egan is Child One's father without establishing another man as Child One's father—does not violate Gina's liberty interest. In *In re Marriage of Slayton*, 292 Ill.App.3d 379, 226 Ill.Dec. 583, 685 N.E.2d 1038 (1997), the Illinois Court of Appeals considered a custody dispute involving the mother of a boy and her ex-husband, who was not the boy's natural father but who was married to the mother when the boy was born. In considering whether awarding visitation to the ex-husband would infringe the constitutional rights of the mother and her new husband, who was the boy's biological father, the court observed "the presumption that

By representing to him that he had adopted Child One when he allowed his name to be added to the certificate, Gina led Egan to take no action to further investigate or establish his status as Child One's father. Finally, Gina allowed Egan to assume the role of Child One's father and to become Child One's psychological parent. In short, by her own words and conduct, Gina rendered her parental rights with respect to Child One "less exclusive and less exclusory" with regard to Egan, *id.*, and accordingly her liberty interests were not infringed by the application of the doctrine of equitable estoppel in these circumstances.

Accordingly, Gina's challenges to FOF 2(a) and CsOL 3, 4, and 7 are without merit.

### B. The family court did not err in finding that Egan did not abuse Gina or their children.

■■■■ Gina essentially argues that she has presented evidence contrary to the court's findings and therefore those findings must be in error. However, "it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." *In re Jane Doe,* 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) (internal quotation marks, citations, brackets, and ellipsis omitted). Instead,

[T]he question on appeal is whether the record contains substantial evidence supporting the family court's determinations, and appellate review is thereby limited to assessing whether those determinations are supported by credible evidence of sufficient quality and probative value. In this regard, the testimony of a single witness, if found by the trier of fact to have been credible, will suffice. Because it is not the province of the appellate court to reassess the credibility of the witnesses or the weight of the evidence, as determined by the family court, the family court is given much leeway in its examinations of the reports concerning a child's care, custody, and welfare.

*Id.* at 196–97, 20 P.3d at 629–30 (internal quotation marks, citations, and brackets omitted).

Applying these principles here, we resolve Gina's points of error as follows:

■■■ 1. Gina argues that custody cannot be awarded to the perpetrator of domestic abuse. She argues that FOF 53 is clearly erroneous because substantial evidence was presented that "proved that Egan abused Gina and the children." Gina argues that CPS confirmed abuse but did not intervene because Egan and Gina were already separated.

FOF 53 states:

Egan did not abuse the children or Gina. [CPS] determined that neither parent abused the children. Neither [Child One] nor [Child Two] appeared to be afraid of Egan. [Child One] interacted with Egan in a completely appropriate manner and [Child One] did not engage in any act of avoidance.

Substantial evidence supported the family court's finding that Egan did not abuse Gina or the children. FOF 54, unchallenged by Gina, states that "[t]here was no medical testimony or evidence that Gina sustained any alleged injuries due to domestic violence." Moreover, Egan testified that Gina's allegations of domestic violence leading to the restraining order against Egan were "false," that he never fought "outside the ring," and that he does not use physical discipline on the children. Dr. Suh, the children's pediatrician, testified that prior to Egan and Gina's separation on October 26, 2003, Gina had not made any allegations or given any indication that Egan abused Gina or the girls. Dr. Suh testified that he did not have concerns about the children being abused. Furthermore, CPS did not "confirm abuse" as Gina alleges. Rather, Ms. Chun testified that she was "very concerned there was domestic violence in [Gina and Egan's] relationship" and that "if [Gina and Egan] had not been separated, the [DHS] may have taken further steps" in its investigation.

Based on the above, we hold that FOF 53 is not clearly erroneous.

the husband is the father of a child born of the marriage ... has long been a part of our common law heritage, and the long recognized rights

of presumed fathers can hardly be said to offend the United States Constitution." *Id.* at 1043.

2. Gina also argues that FOF 55 is clearly erroneous because it misstates the evidence. FOF 55 states:

Although Jean Chun, the [CPS] Social Worker, believed that allegations of abuse against Gina were substantiated by the children, Ms. Chun was not able to investigate or verify independently the allegations of abuse. The children's interviews contained conflicting versions of alleged abuse between the parents, with one version where Gina inflicted abuse on Egan, and another version where Egan inflicted abuse on Gina. Ms. Chun believed the [sic] both parents had contaminated the children's interviews. Ms. Chun was not aware that prior to her initial interview of the children on December 1, 2003, when they were accompanied by Gina, that: (1) Gina had filed an Ex Parte Petition for [TRO] on October 27, 2005 [sic], with the [TRO] prohibiting contact between Egan and the children; (2) the children were in Gina's custody when the initial report of bruising on [Child One] was made; (3) on November 7, 2003, the principal at [Child One]'s school had alerted Gina to concerns about bruising, with Gina picking up [Child One] from school when the initial report of bruising was made to the school.

Gina contends that FOF 55 is clearly erroneous because:

Ms. Chun did not state that CPS could not verify abuse, she stated that they confirmed abuse by [sic] did not intervene because the parents were already separated and a divorce was pending. She also did not state that the children's initial interviews were contaminated. Rather, she suggested that their subsequent interviews may have been contaminated. But, the initial interviews confirmed the alleged abuse.

After reviewing the evidence in the record, we conclude that FOF 55 fairly reflects the testimony of Ms. Chun, and is therefore not clearly erroneous.

3. Gina also argues that FOF 61 is clearly erroneous. FOF 61 states, "In July of 2003, Egan restrained [Anthony] from charging Gina. [Anthony] tripped and fell over the couch. Egan, Gina and the Buteras went out to a celebratory dinner afterwards." Gina argues that FOF 61 is clearly erroneous because the evidence "established that Egan charged [Anthony] and pushed him down, not that [Anthony] fell while being restrained by Egan."

However, Egan testified that he tried to stop Anthony from reaching Gina during an argument and that Anthony tripped over a corner of a leather couch, falling onto a rocking chair and then to the floor. This testimony supports FOF 61, which is therefore not clearly erroneous.

4. Gina next argues that FOF 62 is clearly erroneous. FOF 62 states that "Egan did not damage Gina's breast implants and the operation that Gina had in December of 2003 to repair her breast was due to post augmentation [sic] with unacceptable results." Gina argues FOF 62 is clearly erroneous because "Dr. Acklin testified that the surgeon who repaired Gina's breast implants reported that [he] thought the injury was due to trauma, but that there might have just been a need for an adjustment." Gina asserts that "the evidence established that the likely cause of the injury was trauma ... with only the possibility that it was due to unacceptable results from the augmentation surgery."

However, there is substantial evidence in the record to support FOF 62. FOF 54, unchallenged by Gina, states that "[t]here was no medical testimony or evidence that Gina sustained any alleged injuries due to domestic violence." Egan testified that when he met Gina, she told him that her breast "distortions" were a result of a "bad boob job." Egan further testified that Gina's breasts began "drooping" with each pregnancy and also "started getting more offset." Having found substantial evidence to support this finding in the record, we hold that FOF 62 is not clearly erroneous.

5. Gina also argues that FOF 64 is clearly erroneous. FOF 64 states:

Gina claimed that she needs to move to Texas because it is dangerous for her to remain in Hawaii. She alleged [that] a man wearing [a] Grappling Unlimited Sweatshirt assaulted her and she was punched three times in the eye. The records from CPS indicate that Gina reported that she had black and blue marks on her jaw. Pictures submitted by Gina were not

consistent with either getting punched in the eyes three times on the day before the pictures were taken or that Gina had black and blue marks on her jaw. Gina's versions as to the location of the alleged assault were inconsistent, with one version being that the alleged assault occurred outside of her townhome and the other that she was assaulted inside the townhome.

Gina claims FOF 64 is clearly erroneous because "Gina's testimony in regard to the assault was not controverted[, and] Egan only denied having anything to do with the assault." However, Dennis Tadio and Crystal Kaahanui both testified that although Gina told both of them that someone wearing a Grappling Unlimited shirt had broken into her home, she did not say that she had been attacked or beaten by that person. Gina testified that she was attacked as she exited her car and was hit "two or three times" in her face. The family court viewed the pictures that Gina took the night of the alleged attack and heard testimony that was inconsistent with Gina's account of what happened. We leave issues of credibility to the trial court, *In re Jane Doe*, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001), and since there is substantial evidence to support this finding, FOF 64 is not clearly erroneous.

6. Gina argues that CsOL 17 and 18 are wrong. These CsOL state:

17) Based on the credible and reliable evidence adduced at trial, the Court finds and concludes that Egan did not commit domestic violence against Gina, whether a single act or occurrence or a pattern or history of such violence.

18) Based on the credible and reliable evidence adduced at trial, the court finds and concludes that Egan did not commit domestic violence against Gina on October 26, 2003.

Because we hold that FsOF 53, 55, and 62 are not clearly erroneous, this argument has no merit. *See* IV.B.1., IV.B.2. and IV.B.4., above.

7. Gina finally argues that the family court "improperly refused to receive" evidence consisting of: (a) a copy of an October 27, 2003 police report, in which Gina alleged that Egan had assaulted her on the previous day, and (b) Gina's testimony of what she told the police when she made that report. The court ruled that the report was not properly authenticated and that Gina's testimony about what she told the officers when she made the report was hearsay. Gina contends that the report and her testimony should have been admitted under Hawai'i Rules of Evidence (HRE) Rules 801 (Supp. 2006), 803(b)(6) (Supp.2006), 803(b)(8) (1993), and 901(a) & 901(b)(1) and (2) (1993) which state, in relevant part:

**Rule 801. Definitions.** The following definitions apply under this article:

"Declarant" is a person who makes a statement.

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

"Statement" is an oral assertion, an assertion in writing, or nonverbal conduct of a person, if it is intended by the person as an assertion.

**Rule 803. Hearsay exceptions; availability of declarant immaterial.** The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(b) Other exceptions.

. . . .

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of regularly conducted activity, at or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

. . . .

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public

offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil proceedings and against the government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

**Rule 901. Requirement of authentication or identification.** (a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, ... the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.

(2) Non-expert opinion on handwriting. Non-expert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

 Gina argues that the police report was admissible both as a "record of regularly conducted activity," HRE Rule 803(b)(6), and a "public record and report," HRE 803(b)(8). However, where a police report constitutes "merely a recitation of a third-party's out-of-court statements that fell under no other exception to the hearsay rule," rather than factual findings, opinions, and conclusions based on an officer's own investigation, the police report is not admissible under HRE Rule 803(b)(8)(C), *State v. Jhun*, 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996), or HRE 803(b)(6), *see Warshaw v. Rockresorts*, 57 Haw. 645, 650, 562 P.2d 428, 433 (1977) (in a case predating the HRE, the Supreme Court of Hawai'i excluded as hearsay a series of accident reports offered as business records, as they contained the statements of persons who were not employed by the business and who were therefore "without a business duty to observe and report"); Commentary to HRE Rule 803 (Supp.2006) (stating that the holding of *Warshaw* is "unaffected by the new rule"); *see also* Addison M. Bowman, *Hawaii Rules of Evidence Manual* § 803–3[5][C] (3d ed.2006) [hereinafter *Bowman* ]. Even if a police report does contain findings and observations based on an officer's investigation, a witness's statement within the report is only admissible under an independent hearsay exception. *Bowman* at § 803–3[7][f]. We cannot identify a hearsay exception that would support the admission of Gina's statement, and, accordingly, the family court did not err in refusing to admit the report.

 Gina next argues that she should have been allowed to testify as to the contents of the police report. Gina contends that because hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing," HRE Rule 801, her testimony as to the contents of the report was not hearsay because she was testifying. Gina, however, misinterprets this rule. The requirement that a qualifying statement be "other than one made by the declarant while testifying" means that "a witness'[s] testimony is not hearsay but that her prior statements are hearsay." *Bowman* at § 801–2. Moreover, Gina attempted to introduce her prior statements "for the truth of the matter asserted," i.e., that Egan did abuse her, as she reported to the police. HRE Rule 801.

Gina's arguments therefore have no merit, and the family court properly excluded both the police report and Gina's testimony about her statements to the police.

**C. The "best interests of the child" standard for determining custody issues is applicable here**

1. Gina first argues that CsOL 8, 9, 10 and Order 2 are wrong because the "best interests of the child" standard is "not the criteria in cases where domestic violence is established." The CsOL state as follows:

8) Under H.R.S. § 571–46, the sole issue in awarding custody is the children's

best interests. *Fujikane v. Fujikane*, 61 Haw. 352, 604 P.2d 43 (1979). "The welfare of the children continues to be paramount over the claims of either parent, be he or she the resident or nonresident." *Gillespie v. Gillespie*[,] 40 Haw. 315, 321 ([1953]). This is an issue of ultimate fact. *In re Jane Doe*, 7 Haw.App. [547], 784 P.2d 873 (1989).

9) The Court finds and concludes that it is in the best interest of the children to award sole legal custody of the children to Egan. It is not in the best interests of the children for Egan and Gina to share legal custody of the children. Egan and Gina are unable to communicate and work together to make decisions which are in the children's best interests.

10) The Court finds and concludes that based upon the totality of the circumstances of this case and the credibility of the witnesses, Egan is better able to provide the children with a stable, more well-balanced environment in which they may thrive.

(Original brackets omitted.)

Order 2 states as follows:

Egan is awarded sole legal and sole physical custody of the three minor children subject to Gina's rights of reasonable visitation. If Gina decides to relocate off-island, she shall have "Type B" visitation with the children. And if Gina elects to reside in the same locale as Egan, she shall have Type "A" visitation rights. Both visitation schedules are attached hereto as Exhibit "1".

Because we have upheld the family court's conclusion that Egan did not commit domestic violence, Gina's argument that the "best interests" standard does not apply is moot.

Gina next argues that CsOL 8, 9, and 10, and Order 2 are wrong because "custody of [Child One] could not be awarded to Egan in any event, because he was not her legal father, and because Gina, her legal mother, was not unfit and had not abandoned her." However, because we hold that Egan is Child One's presumed father and Gina is estopped from challenging this presumption, this argument is also moot.

2. Gina argues that CsOL 11, 12, and 13 are wrong because "there is no presumption that a parent who remains in Hawai'i should be awarded custody if the other parent is relocating."

COL 11 states as follows:

Under H.R.S. § 571-46, the Court is authorized to award custody of the children to a parent who is remaining in Hawaii instead of a parent who is moving out of Hawaii. *Maeda v. Maeda*, 8 Haw.App. 139[,] 794 P.2d 268 (1990).

*Fisher v. Fisher*, 111 Hawai'i 41, 137 P.3d 355 (2006) established that:

HRS § 571-46 gives the family court the power, where warranted by the facts, to award sole legal and physical custody of a child to his mother subject to the condition subsequent that the award of [the child's] custody to [the child's] mother will be automatically terminated and awarded to [the child's] father ... when [the child's] mother effectuates her plans to move with the child to a new residence out of the family court's jurisdiction.

*Id.* at 49, 137 P.3d at 363 (citing *Maeda v. Maeda*, 8 Haw.App. 139, 142, 794 P.2d 268, 269–70 (1990)).

■■■■ However, residency or relocation of a parent is not determinative in a custody dispute. Rather,

Hawai'i courts have consistently adhered to the best interests of the child standard as paramount when considering the issue of custody. In so doing, the family court is granted broad discretion to weigh the various factors involved, with no single factor being given presumptive paramount weight, in determining whether the standard has been met.

*Id.* at 50, 137 P.3d at 364.

Gina is, therefore, correct that there is no presumption of an award of custody to a parent who remains in Hawai'i rather than one who leaves Hawai'i. The family court, however, did not recognize such a presumption in COL 11, but merely held that "the Court is authorized to award custody of the children to a parent who is remaining in Hawaii instead of a parent who is moving out of Hawaii." COL 11 is therefore not wrong.

■■■ COL 12 states:

"Courts in awarding custody ordinarily will prefer a resident parent over the other parent who is either a nonresident or a resident contemplating immediate removal from the jurisdiction where both parents are equally fit to have custody." *Gillespie v[. Gillespie,* 40 Haw. 315, 321 (1953) ].

*Gillespie* also held, however, that "the welfare of the children continues to be paramount over the claims of either parent, be he or she the resident or nonresident." *Id.* at 315. In *Gillespie,* the parties' divorce decree awarded the parents joint custody of their children and expressly stipulated that neither party could remove the children from the Territory without a court order. *Id.* at 316. However, the circuit court later granted the mother's motion to amend the decree, awarding her sole custody and granting her permission to remove her children from Hawai'i to the mainland. *Id.* at 318. The Hawai'i Supreme Court reversed the amended order, holding that because the mother merely alleged that she had remarried an enlisted man who was now being transferred, she had not met her burden of proof in establishing that it was in the best interests of the children to require the change in custody and the children's removal to the mainland. *Id.* at 324. The court noted:

> [T]he record is barren of a sufficient basis on which to ascertain whether the change she contemplates will be beneficial or detrimental to the children. On that state of the record the benefits to the children must be considered which flow from being wards of the court within its protective jurisdiction and from being in their father's custody where the surrounding circumstances are known to be good.

*Id.* at 323–324.

In *Estrella v. Estrella,* 43 Haw. 210 (1959), the Hawai'i Supreme Court clarified its holding in *Gillespie,* stating that:

> While the court did refuse in the *Gillespie* case to permit the mother of minor children ... to take them to the mainland after her remarriage, and the opinion did contain some rather unnecessarily emphatic statements against permitting the removal of the children from the court's jurisdiction, it did not in any way attempt to overrule the well recognized rule [that] "[i]n determining divorced parents' claim to child's custody, child's welfare is paramount." In the *Gillespie* case there was *no allegation* and *no proof* that the best interests of the children would be served by their removal from the Territory.

*Estrella,* 43 Haw. at 213–14 (citation omitted; emphasis in original).

 Thus, although COL 12 correctly quotes *Gillespie,* the quoted passage is wrong to the extent that it implies that there is a presumption in favor of the resident parent. However, we hold any error to be harmless since the CsOL, when read as a whole, clearly reflect that the family court did not apply a presumption but rather considered the evidence in determining what was in the best interests of the children. *See Fisher,* 111 Hawai'i at 50, 137 P.3d at 364.

We next turn to COL 13, which states:

> The Court finds and concludes that it is in the best interests of the children to remain in Hawaii for purposes of stability and continuity in their lives. The children have lived in Hawaii during their entire lives. Their health care providers are located in Hawaii. The children have attended school and participated in extracurricular activities in Hawaii. The children have strong ties to the community and their family in Hawaii.

COL 13 is not wrong since it clearly reflects that the family court considered the children's interests in light of the specific circumstances of this case, rather than applying a presumption. Having found that Egan did not commit domestic violence, the family court was left to award custody based on the "best interests of the child" standard. *Id.* CsOL 14, 15, and 16 state in part, and Gina does not contest, that:

> 14) ... [A]lthough both parents have influenced the children regarding the ongoing disputes particularly on the issues of custody and visitation, Gina appears to have interfered more with Egan's relationship with the children....

> 15) ... Gina has demonstrated questionable judgment in her decision-making with respect to the children....

> 16) ... Gina's decision making in terms of her personal life is questionable and said

decisions have affected the quality of her parenting. . . .

Furthermore, Gina does not challenge the determination in COL 10 that "Egan is better able to provide the children with a stable, more well-balanced environment in which they may thrive."[14]

Gina also generally argues that "a parent's plan to relocate in response to domestic violence cannot statutorily be considered as a factor in awarding custody." Because we uphold the family court's conclusion that Egan did not commit domestic violence, this argument is moot.

### V. Conclusion

We hereby affirm (1) the Divorce Decree filed June 9, 2006, (2) the Order Re: Trial filed March 14, 2006, and (3) the "Order Re: Defendant's Motion for New Trial, Reconsideration, Alteration and/or Amendment of Order filed March 14, 2006; filed on March 24, 2006," filed June 2, 2006.

14. Gina challenges other aspects of COL 10, arguing that it is wrong because "the best interest standard is not the criteria in cases where domestic violence is established[,]" and because Egan is not Child One's "legal father" and Gina is "not unfit and had not abandoned [Child One]."