## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2019, 9:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan M. Young
Law Office of Jonathan M. Young, P.C.
Newburgh, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anndee L. Rinkel, <br> *Appellant*, <br><br> v. <br><br> Robert T. Rinkel, <br> *Appellee*. | April 30, 2019 <br><br> Court of Appeals Case No. 18A-DC-2195 <br><br> Appeal from the Spencer Circuit Court <br><br> The Honorable Karen Werner, Temporary Judge <br><br> Trial Court Cause No. 74C01-1702-DC-125 |

**Brown, Judge.**

[1] Anndee L. Rinkel ("Mother") appeals the trial court's Decree of Dissolution Order on All Remaining Issues that, following the dissolution of her marriage to Robert T. Rinkel ("Father"), divided the marital estate, awarded Father physical and sole legal custody of N.R., born on February 20, 2009, and ordered her to pay Father child support. Mother raises several issues which we revise and restate as:

I.    Whether the trial court violated her due process rights by suspending her parenting time and ordering supervised parenting time;

II.   Whether the court erred in denying her request for DNA testing;

III.  Whether the court abused its discretion in admitting certain testimony; and

IV.   Whether the court erred in granting Father physical and legal custody of N.R.

We affirm.

## Facts and Procedural History

[2] On February 22, 2017, Father filed a petition for dissolution of marriage, which indicated that he resided in Santa Claus, Indiana, the parties were separated on January 20, 2017, Mother was not pregnant, and N.R. had been the "one child born of th[e] marriage." Appellant's Appendix Volume II at 19. That same day, he also filed a Motion for Provisional Order and Temporary Restraining Order, an affidavit in support of the motion, and an emergency petition for custody of N.R. The emergency petition indicated that the parties last resided together at the Santa Claus residence; N.R. did not move with Mother when

she left on January 20, 2017, to a residence in Owensboro, Kentucky; on February 14, 2017, Mother entered the Santa Claus residence at 6:30 a.m., insisted she was going to pick up N.R. to drop him off at school, and did so without Father's consent; Father later learned that N.R. had not arrived at school and was not at school that day or the following day; and that Father had filed a petition under a separate cause number for order of protection on behalf of N.R. against Mother on February 14, 2017, and said petition was granted.[1] The petition further stated that Father had reason to believe that Mother may attempt to take N.R. in spite of the order based upon her recorded statement to her father, with whom Father resides; Mother suffered from Borderline Personality Disorder, refused to attend counseling, and was unable to control her emotionally abusive outbursts; and granting Father custody was in the best interest of N.R. to protect N.R. from Mother's emotional abuse.

[3] An entry in the chronological case summary ("CCS") states that the court held a hearing on Father's emergency petition for custody on April 6, 2017, at which Mother appeared in person and by counsel, the court "[began] hearing testimony and evidence," and the court ordered Mother to have parenting time supervised by Sharon Shoulders. A CCS entry indicates that Mother appeared in person and by counsel on June 8, 2017, that testimony and evidence on the

---

[1] The chronological case summary in cause number 74C01-1702-PO-110, which is titled "[N.R.] vs. [Mother]," contains a February 14, 2017 entry which states that N.R., "by Child's Next Friend, [Father], files Petition for an Order for Protection and Request for a Hearing," and a February 16, 2017 entry which states, "Ex Parte Order for Protection. (See Entry)." Appellant's Appendix Volume II at 56-57 (capitalization omitted). The record does not contain a copy of the filings under that cause number or the Ex Parte Order for Protection.

emergency petition for custody resumed, and that the court ordered Mother's parenting time to continue to be supervised by Shoulders every other weekend on Saturday and Sunday from 9:00 a.m. to 7:00 p.m.[2]

[4] On July 31, 2017, Mother filed a Motion for Clinical Evaluation which requested a clinical evaluation of Father and her father, Richard McMahon, and a Renewed Motion for Appointment of Guardian Ad Litem. On August 30, 2017, Mother filed a Verified Motion for DNA Testing, which requested that the court order each party and the child to submit to a DNA test, and a Petition to End Supervision of Parenting Time. On September 21, 2017, Father filed a petition to modify and suspend Mother's supervised parenting time "pursuant to the Provisional Order filed . . . August 7, 2017."[3] *Id.* at 38. The petition stated that Father had received a call on September 19, 2017, from Shoulders, that she had stated she would no longer provide supervision for Mother's parenting time, and that Mother had made the "visitation so emotionally abusive that [N.R.] is expressing the desire to cease to participate in future parenting time" with her. *Id.* at 39. The court issued an order on the same day temporarily suspending Mother's parenting time "until a hearing should be held" and set a hearing for Father's petition on November 9, 2017. *Id.* at 40. On September 22, 2017,

_____

[2] The record does not contain transcripts of the April 6 and June 8, 2017 hearings.

[3] The record does not contain a copy of an August 7, 2017 Provisional Order. The CCS contains an August 3, 2017 entry which indicates that Father filed a Notice of Filing of Proposed Provisional Order and which states, "Provisional Order (6/18/17 hearing). (SEE ENTRY)." Appellant's Appendix Volume II at 6.

Father filed a Notice of No Objection to Renewed Motion for Appointment of Guardian Ad Litem.

[5] On October 19, 2017, Mother filed an objection to Father's September 21, 2017 petition to modify and suspend parenting time, and the court held a hearing, at which it granted Mother's motion for guardian ad litem and appointed David Heal ("GAL Heal"), denied her motion for DNA testing, granted her motion for clinical evaluation as to Father and denied it as to McMahon, and ordered Mother's parenting time to continue "pursuant to the Provisional Order." Transcript Volume II at 14. In addressing the motion for DNA testing, counsel for Mother stated, "just generally I don't want to get into too much facts but generally there was a period of separation and – and during that period of separation it's possible that it could be someone else" and that "in the response they indicated that – that one had been done previously, however, that was not a court ordered one. I'm not aware of the nature of that. I don't know if it was an at home test. Regardless, my client has doubts as to the validity of that." *Id.* at 8. In response, Father's counsel indicated that "[t]he testing has already been done in 2009. We've submitted . . . the results. Obviously, this was not just manufactured. This . . . was a test that [Mother] and [N.R.] and [Father] submitted to and the combined results are that it's ninety-nine point nine nine nine one percent (99.9991%) likely that – probable that he is the father." *Id.* at 9. A CCS entry indicates that the court held a hearing on November 9, 2017, the parties had reached an agreement on parenting time, and the court approved the agreement.

[6] On May 3, 2018, the court held the first day of its final hearing, at which it heard testimony from Beth Ann York Strodel, the principal at N.R.'s school. Strodel answered affirmatively when Father's counsel stated:

> [O]ne of the other things you told the Guardian Ad Litem on – is that – it says, "The Guardian Ad Litem questioned the Principal if she truly thought [N.R.] would be at risk with [Mother]. Miss Beth Strodel said immediately, 'I feel [N.R.] would definitely be at risk with [Mother] taking him.'" Do you recall that?

*Id.* at 49. Family case manager Nakaa Myers testified that she investigated an allegation of child abuse or neglect by Mother against Father and McMahon, interviewed N.R., Mother, Father, and McMahon, and completed a home check. The court admitted with redaction Petitioner's Exhibit 4, a summary of the findings from Myers's assessment, which states in part that Mother showed Myers a video of N.R. at her home "where he didn't want to go back to his dad's house after their visit"; that the video "appeared he was just a little boy who wanted to spend more time with his mother"; and that Mother stated that, every time she has N.R. for visits, he cries and does not want to leave, Father is never home because he works so much, and that she does not think N.R. needs to be left alone with McMahon. Exhibits Volume at 14. The summary also indicates that Myers conducted an interview with Father on June 22, 2017, and that Father stated Mother "struggles with her anger," "is bipolar," and "has episodes that could last hours or days"; "when something sets [Mother] off everyone pays"; and "when [Mother] gets angry she yells, swears and is volatile." *Id.*

[7] McMahon testified that Father and N.R. lived with him in a residence he owned, answered affirmatively when asked if he was familiar with Mother being hospitalized for mental or emotional problems, and stated that Mother was committed to Butler Hospital in Providence, Rhode Island, when she was approximately sixteen. When asked if there was a time shortly after Mother had moved to Owensboro that she took N.R. with her, McMahon answered "February 13th, it was," and stated that Mother drove up and "took [N.R.] out and [N.R.] had this fear in his eyes that you know that a child shouldn't have," that she was supposed to take N.R. to school but did not take him that day and the next day, and that he and Father went to school and found out that N.R. was not in school at that time. Transcript Volume II at 91. He testified that Mother drank wine every night and that "[s]he'd get one of those boxes of wine and they'd last two (2) days, maybe two (2) nights." *Id.* at 95. He stated that his concern if Mother was to have more time with N.R. was that "she'll revert back to her old self and get not physical but verbally abusive" with N.R. *Id.* at 98. He answered affirmatively when asked if he had seen Mother be verbally abusive to anyone else and stated, "me and [Father]." *Id.* at 99.

[8] Father testified about his efforts to have N.R. returned to him after Mother had taken him in February 2017 and indicated that he did not pick up N.R. until three days later at Mother's house at 11:00 p.m. He stated that, when Mother discovered if she returned to Indiana she could be arrested pursuant to the order for protection, "her boyfriend, George, actually helped facilitate her releasing [N.R.] to me," and that "George was actually very good about saying I'll have

my sister, who's a social worker, be there, you come down." *Id.* at 138-139. When asked if there was a period in 2016 when Mother was between jobs, Father answered "Yes, 2000 – one (1) and two (2) – yeah, because she left the golf course," and he testified about a period of approximately six weeks to two months when Mother's unemployment affected her behavior or mood in the household greatly, she went into a "real deep depression," and the care she provided for N.R. was "[m]inimal." *Id.* at 140-141, 148. He answered affirmatively when asked if he recalled incidents where Mother became very upset with N.R.

[9]     On June 14, 2018, the court continued the final hearing, and the parties stipulated to the admission of Mother and Father's adult psychological exams. During direct examination of Father, the following exchange occurred:

> [Father]: [W]hile we were reconciling [Mother] was involved with another man and myself as well and there was some question as to who the father was so as soon as [N.R.] was born, February 20th, 2009. We talked about it and it was a little bit heartfelt and I remember saying if [N.R. is] my son then we'll work together and stay together and be a family and if he wasn't I'd have to part ways and we'd cross that road when we got there. But it was early spring cause I remember it was still cold out she had a DNA test mail order and –
>
> [Counsel for Mother]: . . . Your Honor, I want insert [sic] an objection here to any results of that DNA test for lack of foundation.
>
> The Court: [Father's counsel]? I'm sorry, I didn't mean to cut you off.

[Counsel for Mother]: I think he can testify that he's – he's got one and that's not my objection that they're testifying that they did one. My objection would be as to the results.

\* \* \* \* \*

The Court: What's the legal objection for what reason?

[Counsel for Mother]: [G]enerally foundation . . . I think to have the results of the test to be admitted we'd have to know chain of custody, we'd have to know who the lab was that did it, and (in audible).

The Court: I understand that part but . . . I guess I should ask [counsel for Father] this. What's the reasoning for you asking . . . him these questions and are you gonna (sic) ask him that question?

[Counsel for Father]: [T]he reason I'm going ask it [sic] – him is because apparently [Mother] continues to maintain that he's not the father without the basis of any new paternity tests and – but we have further evidence that she agreed that he was the father.

*Id.* at 167-169. The court noted Mother's August 30, 2017 motion and overruled the objection, Father testified that Mother had called him, told him that the test had come back, and was elated, and counsel for Mother continued the objection to the results of the DNA test. Father testified that Mother received an email which "gave the results whatever it said. I was . . . the father." *Id.* at 170. Counsel for Father asked, "without saying what those emails or those results said, what did [Mother] say about the results," and Father testified that Mother was "extremely happy" and "elated." *Id.* Counsel for Father inquired as to the reason why Mother was elated, and Father answered, "[t]hat I was the father of [N.R.]," indicated that she and he had further discussions about those results in the ensuing years, and stated:

[B]ut more immediately then we had to get the results to her ex-boyfriend and she did not want to see him or deal with him so she printed a copy of the results and had me go meet him at a convenien[ce]store in Middletown, Rhode Island. A seven eleven (711) to be precise and the reason why I have that copy or had that copy is because I talked with him and I was gonna (sic) give it to him and he had a little disposable wedding camera and he said I don't need a copy I'll take a picture of it. He actually took a couple pictures of it and I remember apologizing to him for the mess. It was just – it was kind of like a man-to-man talk.

*Id.* at 170-171.

[10] Father further testified that he had a prescription for hydrocodone pills related to a 2007 back surgery, that at one point he discovered that his pills were running short and confronted Mother, and that she told him "[w]ell, I only took one (1)." *Id.* at 177. He stated that Mother did not have a prescription for hydrocodone, that she said that they made her feel better, and that "she was very depressed and crying a lot cause she had lost her job in the industrial cleaning business." *Id.* at 178. Father testified that he and Mother were both employed at St. Meinrad Abbey, that they worked at the same time "many times," that N.R. was with McMahon during those periods, and that Mother did not express concerns then about leaving N.R. with McMahon. *Id.* at 190. Father answered in the negative when asked whether, "with regard to sole custody versus joint legal custody, do you believe that you and [Mother] can communicate with regard to . . . major decisions in [N.R.'s] life," and he indicated that that was the reason he was seeking sole custody. *Id.* at 234.

[11]     The court took judicial notice of six reports which GAL Heal had filed.[4]  GAL Heal indicated that he had met with N.R. at Mother's house, at Father's house, and had "probably done three (3) visits at school." *Id.* at 239.  When the court inquired into how N.R. would get to school under a fifty/fifty custody split, GAL Heal testified that Mother would need to take N.R. to school and it probably took twenty-five to thirty minutes, and agreed when the court stated, "that's a pretty long drive and a pretty big deal getting [N.R.] to school." Transcript Volume III at 11.

[12]     On August 14, 2018, Mother filed a renewed motion for DNA testing, and on August 16, 2018, the court continued the final hearing.  Mother testified that she and Father were married on April 18, 2005, and were physically separated from "2007 to gosh, late 2008." *Id.* at 23.  When asked to clarify what she meant by "separated," she stated that Father "physically . . . assaulted me, was arrested, we separated, I filed for divorce the next day." *Id.* at 24.  She indicated that, during that period of time, there was a divorce action "actually finalized" in Rhode Island, but she and Father revoked it before the state's six month waiting period had elapsed. *Id.* at 25.  When asked whether she and Father were residing together eight to nine months prior to N.R.'s birth, she answered, "No, I was actually in a relationship with someone else." *Id.*  She testified that her "favorite thing in the world . . . is Christmas," that she and

---

[4] The record on appeal does not contain copies of these reports.  The CCS contains entries which indicate that GAL Heal filed a report on October 31, 2017, and supplemental reports on January 26, March 8, March 12, May 25, and May 30, 2018.

Father lived in Rhode Island until July 2013 when she had "sort of no choice but to move with [Father] having been out of work for so long and me fully supporting and doing everything," and that she thought, "where can I live where I can be Christmassy (sic) all the time so I picked Santa Claus, Indiana." *Id.* at 28-29. When counsel explained legal custody, and asked who she thought should be granted legal custody of N.R. or if she thought there should be joint legal custody, Mother stated:

> I think that I should given that I am [N.R.'s] only biological parent. Also, given that [Father] refuses to communicate with me. [Father] also is not allowed to bring his phone into work so he's not available in the event of an emergency. If anything happened, I am available twenty-four (24) hours a day, every day, all the time. My decision making skills are also not clouded by narcotic medication that [Father] is required to take. So, I wouldn't want someone making decisions for my son under the influence of narcotics either.

*Id.* at 58. Mother answered affirmatively when asked whether she believed it was in N.R.'s best interest to have a DNA test, despite knowing the "several potential negative outcomes that would come out of even requesting the DNA test." *Id.*

[13] On August 30, 2018, the court entered its Decree of Dissolution Order on All Remaining Issues, which found in relevant part:

> DNA TEST

8.  [Mother] had requested a DNA test to confirm or deny that the [Father] was the biological father of [N.R.]. The Court now denies that request.

CUSTODY OF [N.R.]

9.  The Court has considered all factors required to be considered by Indiana law in determining custody. The Court finds that it is [in] the best interest of the child, [N.R.], that there be no joint legal custody. As evidenced by the existence of the protective order between the parties, the parties are not able to communicate with each other, even for the best interest of [N.R.] The Court therefore finds that it is in the best interest of the child, [N.R.], that [Father] shall have sole legal and physical custody of the child.

PARENTING TIME

10.  [Mother] shall be entitled to Parenting Time with the child as set out in the Indiana Parenting Time Guidelines.

11.  All aspects of the Indiana Parenting Time Guidelines shall apply herein, including the provisions regarding opportunity for additional parenting time.

12.  The Court finds that the maternal grandfather, [McMahon], is a sufficient caretaker of the child.

Appellant's Appendix Volume II at 17.

## *Discussion*

Before addressing Mother's arguments, we note that Father did not file an appellee's brief. When an appellee fails to submit a brief, we do not undertake the burden of developing arguments, and we apply a less stringent standard of review, that is, we may reverse if the appellant establishes *prima facie* error. *Zoller v. Zoller*, 858 N.E.2d 124, 126 (Ind. Ct. App. 2006). This rule was

established so that we might be relieved of the burden of controverting the arguments advanced in favor of reversal where that burden properly rests with the appellee. *Wright v. Wright*, 782 N.E.2d 363, 366 (Ind. Ct. App. 2002). Questions of law are still reviewed *de novo*. *McClure v. Cooper*, 893 N.E.2d 337, 339 (Ind. Ct. App. 2008).

[15] To the extent Mother appeals the court's findings in its order, we observe that, in cases where a trial court enters findings of fact and conclusions of law, first we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *See Lechien v. Wren*, 950 N.E.2d 838, 841 (Ind. Ct. App. 2011). We will set aside the trial court's specific findings only if they are clearly erroneous, that is, when there are no facts or inferences drawn therefrom to support them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id.* The findings control only as to the issues they cover, and a general judgment standard applies to issues upon which the trial court made no findings. *Id.*

## I.

[16] The first issue is whether the trial court violated Mother's due process rights by suspending her parenting time and ordering supervised parenting time. Mother contends that, pursuant to Ind. Code § 31-17-14-2, a court must consider and make a finding as to potential endangerment of the child's physical health or

significant impairment of the child's emotional development. She argues that the court made no such findings when it limited her time with N.R.; "[s]pecifically, [Mother] did not see [N.R.] for fifty-four (54) days without a hearing and even after a hearing, her parenting time was ordered to be supervised."[5] Appellant's Brief at 24. She further asserts that the court suspended her parenting time without a hearing in its September 21, 2017 order by temporarily suspending her parenting time until a hearing was held.

[17] A decision about parenting time requires us to give foremost consideration to the best interests of the child. *Perkinson v. Perkinson*, 989 N.E.2d 758, 761 (Ind. 2013). Generally, parenting time decisions are reviewed for an abuse of discretion. *Id.* If the record reveals a rational basis for the trial court's determination, there is no abuse of discretion. *In re Paternity of G.R.G.*, 829 N.E.2d 114, 122 (Ind. Ct. App. 2005). We will not reweigh evidence or reassess the credibility of witnesses. *Id.*

[18] Ind. Code § 31-17-14-2 provides that a court may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. It further states that parenting time rights shall not be restricted unless there is a finding "that the parenting time might endanger the

---

[5] In her statement of the facts, Mother states Father "sought and received a Protective Order on behalf of himself" and N.R. and that, "[a]fter the Protective Order was issued, [she] did not see [N.R.] again for fifty-four (54) days." Appellant's Brief at 14. In support, she cites her testimony at the August 16, 2018 hearing about having to relinquish N.R. to Father, who filed "a false restraining order" which was served on her in February 2017, and of not "see[ing] [N.R.] again for fifty-four (54) days." Transcript Volume III at 45-46.

child's physical health or significantly impair the child's emotional development." *See Perkinson*, 989 N.E.2d at 762. Despite the word "might" in the statute, this Court has interpreted the language in the statute to mean "a court may not restrict parenting time unless that parenting time 'would' endanger the child's physical health or emotional development." *D.B. v. M.B.V.*, 913 N.E.2d 1271, 1274 (Ind. Ct. App. 2009), *reh'g denied*.

[19] We note that Mother's notice of appeal lists the August 16, 2018 Decree of Dissolution Order on All Remaining Issues as the order being appealed and that Mother did not appeal from the court order granting the Petition for an Order for Protection and Request for a Hearing in cause number 74C01-1702-PO-110. We further observe that Mother does not specify the fifty-four day period during which she alleges she did not see N.R. or receive a hearing and that she does not further develop the argument. The record reveals Father filed a Motion for Provisional Order and Temporary Restraining Order on February 22, 2017, as well as an emergency petition which indicated that Mother removed N.R. from the Santa Claus residence without Father's consent at 6:30 a.m. to drop him off at school, that Father later learned that N.R. was not at school that day or the following day, that a petition for order of protection of N.R. against Mother had been granted, and that Father had reason to believe Mother would attempt to take N.R. despite the order of protection. The court scheduled and held a hearing on April 6, 2017, at which Mother appeared in person and by counsel and it heard testimony and evidence on the emergency petition, and ordered Mother to have parenting time supervised by Shoulders.

The hearing resumed on June 8, 2017, Mother and her counsel were present, and the court heard additional testimony and evidence on the emergency petition. Mother does not provide transcripts of either the April 6 or June 8, 2017 hearings or otherwise point to the record in support of her argument. We further note that Father's petition to modify and suspend parenting time indicated that Shoulders had stated she would no longer provide supervision for Mother's supervised parenting time and that visitation between Mother and N.R. had become emotionally abusive to such a degree that N.R. expressed a desire to cease participating in future parenting time. With regard to the court's September 21, 2017 order, we note that, when the court initially ordered Mother's parenting time to be supervised, the parenting time was scheduled to occur on Saturday and Sunday from 9:00 a.m. to 7:00 p.m. every other weekend. The court held a hearing addressing Mother's parenting time in relation to Father's petition on October 19, 2017. Under these circumstances, we cannot say that the trial court abused its discretion in ordering supervised parenting time or in temporarily suspending parenting time until it was able to hold a hearing.

## II.

[20]  The second issue is whether the trial court erred in denying Mother's request for DNA testing. In essence, Mother argues that determining whether the child is a child of both parties must be accomplished prior to a final decree and that the court did not do so. She maintains that the totality of the evidence casts serious doubt on N.R.'s paternity, and that the court's decision to deny Mother's

request amounts to clear error when "DNA testing is the only evidence that can unequivocally rebut or affirm the marriage presumption" of N.R.'s paternity. Appellant's Brief at 21-22.

The Indiana Supreme Court explained in *Russell v. Russell* that: "[b]efore the dissolution court may make a child custody or support determination, it must first determine whether it has jurisdiction to do so, i.e., whether the child at issue is a 'child of the marriage.'" 682 N.E.2d 513, 515 (Ind. 1997). The Court observed that the inquiry into whether a child is a child of the marriage is a determination by the dissolution court of who the child's parents are for purposes of custody, visitation, and support, and that in paternity proceedings the inquiry is whether a particular man is the child's biological father, and, if so, similar determinations as to support, custody, and visitation are made. *Id.* at 517. Declining to give extensive treatment to the subject of whether "a determination in a dissolution proceeding as to whether a child is a child of the marriage is equivalent to a paternity determination, i.e., determination that the divorcing husband is or is not the child's biological father," the Court presented several broad considerations and observed that in many cases the parties to the dissolution will stipulate or otherwise explicitly or implicitly agree that the child is a child of the marriage; that in such cases, although the dissolution court does not identify the child's biological father, the determination is the legal equivalent of a paternity determination in the sense that the parties to the dissolution will be precluded from later challenging that determination except in extraordinary circumstances; and that, nevertheless, a

child or a putative father is not precluded by the dissolution court's finding from filing a separate action to establish paternity at a later time. *Id.* at 518.

[22] The *Russell* Court observed that, in other cases, the issue of whether a child is a child of the marriage may be vigorously contested and that in such cases the dissolution court has the authority to follow appropriate procedures for making paternity determinations. *Id.* It further noted:

> There will also be cases like the one before us where the divorcing husband and wife will attempt to stipulate or otherwise agree that a child is not a child of the marriage. While we disagree with the Court of Appeals when it says that a dissolution court is without jurisdiction to approve such agreements, we certainly believe that it is well within the discretion of the trial court to withhold approval until paternity has been established in another man. *See In re Marriage of K.E.V.*, 883 P.2d 1246 (Mont. 1994) (court applied equitable estoppel to prevent mother from denying paternity of husband where mother was not seeking to establish paternity in another man; court reiterated that the holding would not bar biological father or child from establishing paternity in father). In this regard, we generally agree with the Court of Appeals in this case in concluding that *L.D.H.* [*v. K.A.H.*, 665 N.E.2d 43 (Ind. Ct. App. 1996),] was wrongly decided, at least to the extent that *L.D.H.* stands for the proposition that paternity actions filed in juvenile court collateral to pending dissolution actions are always improper. In fact, such actions may be the only way in which to establish the paternity of a man other than divorcing husband so as to satisfy the dissolution court that the child is not a child of the marriage and permit the divorce to proceed.

*Id.* at 518-519.

Here, to the extent that Mother contends that she "vigorously contested" the issue of whether N.R. is a child of the marriage, we note that the marriage began in April 2005, that N.R. was born during the marriage on February 20, 2009, that Father filed the petition for dissolution on February 22, 2017, and that Mother first filed a motion for DNA testing on August 30, 2017, despite her assertion that she knew someone besides Father was N.R.'s biological father. Further, Mother does not point to the record to show that she did not encourage a relationship between Father and N.R. or she informed Father that he was not N.R.'s biological father; that she has sought to establish paternity in another man; or that a putative father has sought such action. *See Paternity of I.I.P. v. Rodgers*, 92 N.E.3d 1158, 1162 (Ind. Ct. App. 2018) (observing that it is contrary to public policy to simply disestablish paternity, whereby a child would be declared fatherless) (citing *In re Paternity of Infant T.*, 991 N.E.2d 596, 600 (Ind. Ct. App. 2013), *trans. denied*). Based upon the record and under these circumstances, we conclude that the trial court did not err when it denied Mother's request.

### III.

The third issue is whether the trial court abused its discretion in admitting certain evidence. The admission of evidence is entrusted to the sound discretion of the trial court. *In re A.J.*, 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), *trans. denied*. An abuse of discretion only occurs where the trial court's decision is against the logic and effect of the facts and circumstances before it. *Id.* "The fact that evidence was erroneously admitted does not automatically

require reversal, and we will reverse only if we conclude the admission affected a party's substantial rights." *Id.*

[25] Mother argues the court erred by allowing testimony regarding an in-home DNA test and maintains that not being able to test the validity of the alleged test substantially harmed her. The record reveals that Father testified at the June 14, 2018 hearing about his reconciliation with Mother and discussions surrounding N.R.'s paternity at the time of birth. When Father mentioned that Mother "had a DNA test mail order," Mother's counsel conceded that Father could "testify that he's . . . got one and that's not my objection that they're testifying that they did one" and objected "to any results of that DNA test for lack of foundation." Transcript Volume II at 168. Father's counsel explained that further evidence would show "that [Mother] agreed that [Father] was the father," Father testified that Mother had told him that the test had come back, and Mother's counsel continued the objection as to the test's results. *Id.* at 169. Father then indicated further that Mother was elated when she received an email "whatever it said," clarified that Mother was elated because Father was the father of N.R., and testified that Mother printed a copy of the test results for Father to take to her ex-boyfriend at a Rhode Island convenience store. *Id.* at 170. **(171)** Under the circumstances, we cannot say that the court's decision affected Mother's substantial rights.

[26] Mother also alleges that the court erred by allowing Father to testify regarding her relationship with another person and specifically name that person in court. Ind. Code § 34-12-2-4 provides in part that it is unlawful for someone "to file,

cause to be filed, threaten to file, or threaten to cause to be filed" any pleading or paper naming or describing in such manner as to "identify any person as corespondent or participant in misconduct" of the adverse party in a divorce action. We note that Mother did not object when Father first mentioned the relationship or the individual's name and that Mother's own testimony identified the individual by name. Based upon the record, we cannot say that the court abused its discretion in admitting the challenged testimony.

IV.

[27] The fourth issue is whether the trial court erred in granting Father physical and legal custody of N.R. We note that it is well established that the trial court has statutory authority to determine custody and enter a custody order in accordance with the best interests of the child. *See* Ind.Code § 31-17-2-8. Further, in determining the best interests of the child, the trial court shall consider all relevant factors, including the age and sex of the child, the interaction and interrelationship of the child with the child's parents and any other person who may significantly affect the child's best interests, the child's adjustment to the child's home, school, and community, and the mental and physical health of all individuals involved. *See id.* We further note that, as the Indiana Supreme Court has stated:

> Appellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time. Thus enabled to assess credibility and character through both factual testimony

and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children.

*Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). "Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." *Id.* (citing *Ind. Dep't. of Child Servs. v. LaPorte Circuit Court (In re T.S.)*, 906 N.E.2d 801, 804 (Ind. 2009); *J.I. v. J.H. (In re K.I.)*, 903 N.E.2d 453, 457 (Ind. 2009); *Dunson v. Dunson*, 769 N.E.2d 1120, 1123 (Ind. 2002)). We decline Mother's request to reweigh the evidence. The court found that the parties were not able to communicate with each other, even for N.R.'s best interests. The court could reasonably determine from the evidence presented that Mother and Father lacked the kind of cooperative relationship that would warrant an order of joint custody and that granting Father primary physical and legal custody, subject to Mother's parenting time as set out in the Indiana Parenting Time Guidelines, was in N.R.'s best interests. Viewing the evidence most favorably to the court's determinations, we conclude that the trial court did not err or abuse its discretion in its decision.

[28] For the foregoing reasons, we affirm the trial court's order.

[29] Affirmed.

Bailey, J., and Bradford, J., concur.